The AMERICAN BEARING COMPANY, INC.

v.

LITTON INDUSTRIES, INC. and Litton Industrial Products, Inc.

Civ. A. No. 78–2003.

United States District Court, E. D. Pennsylvania.

May 26, 1982.

C. Gary Wynkoop, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for plaintiff.

Michael W. Graney, Howrey & Simon, Washington, D. C., John T. Clary, Clary, Mimnaugh & McGonigle, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This case comes before the Court on the post-trial motion of defendant Litton Indus-trial Products, Inc. for judgment notwith-standing the verdict or, in the alternative, for a new trial. The jury returned a ver-dict finding Litton liable for both monopoli-zation and attempted monopolization in vio-lation of § 2 of the Sherman Act and as-sessed damages in the amount of $958,-691.00. For the reasons set forth below, the Court has determined to grant a new trial with respect to plaintiff's § 2 Sherman Act claims.

■ Respect for the collective wisdom of the jury is sufficient in most cases to enable the judge to accept the findings of the jury regardless of his own doubts in the result reached by the jury. However, the trial judge must grant a new trial when his failure to do so would result in a miscar-riage of justice. I find that there has been a miscarriage of justice in this case.

## I. BACKGROUND

Plaintiff American Bearing Company, Inc. is a New Jersey corporation that was formed in 1970 by Ronald L. Roman and Robert A. Furchak. The offices and manu-facturing facilities of American Bearing Co. are located in Fairfield, New Jersey. De-fendant Litton Industrial Products, Inc.[1] is a Delaware corporation which manufac-tures a wide variety of industrial products and equipment and its Merriman Division, located in Hingham, Massachusetts, manu-factures and sells a variety of bearings for use in construction and industrial applica-tions [both Litton Industrial Products, Inc. and its Merriman Division will hereinafter be referred to collectively as Litton]. The plaintiff American Bearing Co. (American Bearing) also manufactures bearings for use in construction and industrial applica-tions. One type of bearing which they both manufacture is called a slide bearing.

Slide bearings are used in the heavy con-struction industry to allow structures to

1. Litton Industries, Inc., Litton's parent corpo-ration, was also named as a defendant, but was dismissed by the Court.

move in response to the expansion and contraction of their component materials. Slide bearings are manufactured in a variety of sizes and are made from a variety of materials such as bronze, meehanite and steel. The different base materials from which the bearings are made, together with other factors such as the coating affixed to the bearing's surface and lubricants used in conjunction with the bearing, affect the parameters at which the bearing can operate, expressed in terms of temperature, pressure per square inch and coefficient of friction. The type of bearing which can be used in a given structure varies according to the type and size of each structure. Typically, the builder or manufacturer of a given structure will designate the parameters at which the bearing will be required to operate and the bearing manufacturers will then submit bids for those of their bearings which will meet the requirements of the given job. Sometimes the builder or manufacturer of the structure will also specify the type of bearing preferred for use, such as a bronze or meehanite bearing.

Among the structures which require the use of slide bearings are electrostatic precipitators and baghouses which are huge structures used to control pollution by removing harmful elements from industrial discharges. Due to the large size and high operating temperatures of these structures they require slide bearings which can operate at high temperatures and pressures. In early 1975 Litton began selling slide bearings for use under electrostatic baghouses and precipitators. Although other types of bearings were also being used in baghouses and precipitators, a teflon-coated bearing developed and patented by Litton became very popular for use in these structures because it could operate at high temperatures with a low coefficient of friction while under heavy load conditions. Because of its patent, Litton was virtually the only source of teflon-coated bearings.

Sometime in 1975 American Bearing, a company formed by Ronald Roman and Robert Furchak, began developing a new method of producing a teflon-coated bearing. Beginning in or about June 1975,

American Bearing began contacting potential purchasers of this bearing and distributed literature promoting its use. The literature distributed by American Bearing said that the bearing, which American Bearing called its "Hi-Load" bearing, would work at specifications of 400° F, 3000 pounds p.s.i., with a 3% coefficient of friction. In connection with the promotion of its bearing, American Bearing prepared 2" by 2" sample bearings for use as sales aids. American Bearing made its first sale and shipment of production bearings in May or June of 1976.

In or about March 1976 one of Litton's salesmen obtained one of the American Bearing sample bearings. During the course of two days, Litton subjected the bearing to 16 hours of testing after first cutting the bearing in half. The results of the testing, together with a conclusion which stated "Therefore it is our opinion that this bearing cannot function at the specified load and temperature conditions", were set forth in a test report dated March 26, 1976. The conclusion stated in the report was based on the observation that the surface of the bearing exhibited some cracking and "extruding". Litton sent the test report to a number of precipitator and baghouse manufacturers and gave copies to their (Litton's) sales personnel for use in the field.

On June 15, 1978, American Bearing initiated this suit alleging that Litton's test report was false and that its publication by Litton constituted product defamation. In addition, American Bearing asserted that Litton had attempted to monopolize and/or monopolized the market for slide bearings between 1976 and June 15, 1978.

At trial, American Bearing presented testimony, the thrust of which was that Litton knew or should have known by the size of the bearing and the attendant circumstances that the tested bearing was a sample—a sales aid as opposed to a functional bearing and had not been manufactured with the intention that anyone would use it. Furthermore, it was testified that cutting the

bearing in half, as Litton did for its tests, destroyed its structural integrity. In addition, Professor Roll, an expert testifying on behalf of American Bearing, stated that he had tested functional teflon-coated bearings produced by American Bearing and that they met the specifications stated by American Bearing.

In addition to Professor Roll, American Bearing also presented the testimony of three other expert witnesses: Mr. Albert Hudson, Mr. Robert McIlvaine and Professor Gary Bowman (hereinafter "economist"). Mr. Hudson's experience in this field included a period of employment as the Head Mechanical Engineer for the Tennessee Valley Authority Fossil and Air Pollution Control Equipment in which capacity he organized and directed the largest air pollution retrofit program in the utility industry. Mr. Hudson supplied general information relating to the structure and purposes of baghouses and precipitators and the advantages inherent in the use of teflon-coated slide bearings in those structures. Mr. Hudson testified that although the actual operating temperatures of many baghouses and precipitators may be below 400° it was the practice in the industry to use a bearing capable of operating at 400° with a low coefficient of friction in order to allow an ample margin of safety. Mr. Hudson also testified that the relationship between the cost of slide bearings relative to the flange to flange cost of precipitators and baghouses is such that these bearings account for .3% of the flange to flange cost.

Mr. Robert McIlvaine offered his expert opinions and conclusions with respect to the national market for "hot" precipitators and fabric fibers (baghouses), that is, precipitators and baghouses which operated in excess of 250°. Mr. McIlvaine presented figures representing the dollar value for the sales of "hot" precipitators and baghouses in the national market for the years 1976–80 with projections of sales through 1983 and testified as to the market shares of various baghouse and precipitator manufacturers.

The economist whose testimony, together with that of Messrs. Hudson and McIlvaine, is discussed in greater detail later in this memorandum, testified with respect to a market study he conducted of the "thermal" bearing industry. The economist defined a "thermal" bearing as a bearing which operates at 400° F, at a pressure of 3000 pounds p.s.i., with a 3% coefficient of friction. He gave his opinion that a separate product market exists for thermal bearings for use in the support structures of baghouses and precipitators and that the geographical scope of the market is nationwide. Using the figures calculated by Messrs. Hudson and McIlvaine, he calculated the size of the relevant market in terms of the total dollar amount of sales of thermal bearings for the years 1976–1983. He also offered his opinion as to the share of the market American Bearing would have attained in the absence of any illegal conduct, as well as to the actual market shares of American Bearing and Litton for the years 1976–1980. The economist also testified that American Bearing's failure to achieve the projected market shares was attributable solely to Litton's circulation of a false test report. Lastly, he calculated the amount of profits American Bearing purportedly lost in the past and would continue to lose through 1983 as a result of Litton's circulation of the test report.

Litton, on the other hand, offered evidence that it had manufactured sample bearings in the past, and that the bearings were functional and that Litton had performed tests on its sample bearings. Litton also offered evidence tending to show that baghouse and precipitator manufacturers did not as a routine practice designate specifications of 400° F, 3000 pounds p.s.i., and a 3% coefficient of friction when requesting bids for slide bearings to be used in their baghouses and precipitators and that bearings other than teflon-coated bearings could and, in some instances, were used in electrostatic precipitators and baghouses. In addition, Litton presented evidence that American Bearing's bids were rejected because of its failure to meet the requirements for bidders specified by the baghouse and pre-

cipitator manufacturers, such as bid submission deadlines or the submission of a test report pertaining to their bearing prepared by an independent library.

On July 9, 1981, after three weeks of trial, the jury rendered a verdict on special interrogatories in which it found that Litton was not liable for product defamation, but was liable for both monopolization and attempted monopolization in violation of § 2 of the Sherman Act and assessed damages in the amount of $958,691.00. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, the Court entered judgment in favor of American Bearing on June 10, 1981 in the trebled amount of $2,876,073.00. Litton then filed the motions now before the Court.

## II. STANDARDS FOR GRANTING MOTIONS FOR JUDGMENT N.O.V. AND NEW TRIAL

In order to grant a motion for judgment n.o.v. the Court must find as a matter of law that the plaintiff failed to adduce sufficient facts to justify the verdict. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir. 1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Such a motion "may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A *Moore's Federal Practice*, ¶ 50.07[2] at 50–77 (footnote omitted) (2d ed. 1974); *Thomas v. E. J. Korvette, Inc.*, 476 F.2d 471, 474 (3d Cir. 1973). In making this determination "it is the duty of the trial court to take that view of the evidence most favorable to the party against whom the motion is made . . ." 6A *Moore's, supra*, ¶ 59.08[5] at pp. 59–152 (1979); *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 518 F.Supp. 102, 105 (E.D. Pa.1981).

Motions for a new trial require the exercise of discretion by the Court, whose "duty is essentially to see that there is no miscarriage of justice." 6A *Moore's, supra* ¶ 59.08[5], at 59–160 (footnote omitted) (1974), *Thomas v. E. J. Korvette, Inc.*,

476 F.2d 471, 474–75 (3d Cir. 1973). The jury's verdict may be set aside only if manifest injustice will result if it were allowed to stand. The Court may not substitute its own judgment for that of the jury merely because the Court may have reached a different conclusion.

## III. LITTON'S MOTION

Litton has asserted numerous and overlapping arguments in support of its motions for judgment n.o.v. or a new trial. In general, Litton claims that American Bearing produced insufficient evidence to support the jury's verdict on the § 2 Sherman Act claims in several material respects; that portions of the Court's jury instructions relating to the Sherman Act claims were erroneous, and; that the Court erred in various evidentiary and discovery rulings, particularly in its failure to grant Litton's motions to strike the testimony of the plaintiff's economist.

At the hearing on Litton's motion, held on February 19, 1982, counsel for Litton focused on the following contentions with respect to its claim for judgment n.o.v.: (1) American Bearing failed to prove that Litton's allegedly unlawful conduct was the proximate cause of injury to American Bearing; (2) that there was insufficient evidence for the jury to find that the relevant market as defined by American Bearing existed and insufficient evidence for the jury to determine the parties' market shares; and (3) that American Bearing failed to prove the exercise of monopoly power by Litton. Litton's argument relating to American Bearing's purported failure of proof centered upon the expert testimony of plaintiff's economist whose testimony constituted an integral part of the proof offered by American Bearing in support of its Sherman Act claims. Litton asserts that his testimony was based on numerous unsupported assumptions and was too speculative and misleading to prove a sufficient basis for the jury's verdict. In addition, Litton argued that the speculative and misleading nature of the economist's testimony, his reliance on unsupported assumptions

and his alleged reliance on hearsay statements of a type not reasonably relied upon by experts in the field rendered his testimony inadmissible and that the Court erred in failing to strike his testimony as requested by Litton at trial.

## IV. LITTON'S ARGUMENTS RELATING TO THE TESTIMONY OF PLAINTIFF'S ECONOMIST

Litton's arguments in support of its motions for judgment n.o.v. and a new trial are for the most part grounded upon the expert testimony of plaintiff's economist. At trial, Litton moved to strike his testimony in its entirety, asserting that it was speculative, misleading, based on unsupported assumptions and based on hearsay statements of a type not reasonably relied upon by experts in the field. Litton now asserts that the Court erred in denying its motion to strike and relying essentially on these same arguments, asserts that the testimony of the economist was not sufficient evidence upon which a jury could have determined the relevant market and market shares, the existence of proximate cause and the amount of damages. Since the Court has determined that certain critical portions of the economist's testimony should have been stricken for reasons hereinafter discussed and that there has been a miscarriage of justice, the only appropriate remedy is a new trial. Therefore, a lengthy review of the sufficiency of the evidence would be fruitless since, under these circumstances, even if the remaining evidence is insufficient to support the jury's verdict, the Court, in the interest of justice, will exercise its discretion under Fed.R.Civ.Pro. 50(b) and will order a new trial and will deny the motion for judgment n.o.v. in favor of Litton. *Cone v. West Virginia Pulp & Paper*, 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849 (1947); 5A *Moore's Federal Practice* ¶ 50.11.

### A. *The Applicable Legal Principles*

Rule 703 of the Federal Rules of Evidence provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Under Rule 703 an expert may testify to an opinion based on information which is not necessarily admissible into evidence provided the information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Zenith Radio Corporation v. Matsushita Electric Industrial Co., Ltd.*, 505 F.Supp. 1313, 1322 (E.D.Pa.1980) [hereinafter *Zenith Radio*].

When an expert bases an opinion upon facts or data which are not in evidence the question as to whether the facts or data are of the type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject is a matter to be determined by the court. As stated by Judge Becker in *Zenith Radio, supra* at 1325, "... it is nonetheless plain that courts routinely make the decision whether a particular expert has reasonably based his opinions upon trustworthy underpinnings. * * * Moreover, any other result would open the door to wholesale admission of otherwise inadmissible evidence before the jury not, to be sure, as probative of the truth, but to explain the expert's opinion. Such a result could not have been contemplated by the rule."

In *Zenith Radio, supra*, a case in which the court determined, in advance of trial, the admissibility of opinions expressed in various expert reports, the court noted that Rule 703 had evolved from an exception to the hearsay rule which had been employed in a number of jurisdictions and which was originally limited to a "traditional mainstream" of cases which the court identified as: cases in which a physician was permitted to testify based upon information received from nurses, patients, radiologists, pathologists, etc.; cases involving expert

testimony relating to land valuation based upon comparable sales, and; cases in which courts permitted experts to testify as to the valuation of businesses based upon diverse background sources, including accounting data. See discussion of the history of Rule 703 in *Zenith Radio, supra* at pp. 1321–1324. Based upon a thorough review of the cases precursing Rule 703, the cases applying Rule 703, Rule 703 itself, the Advisory Notes, and the history of the Rule, Judge Becker set forth a list of factors to be used to guide a court in determining the reasonableness of reliance under Rule 703 in cases falling outside this traditional mainstream of cases. These factors are:

1. The extent to which the opinion is pervaded or dominated by reliance on materials judicially determined to be inadmissible, on grounds of either relevance or trustworthiness;

2. The extent to which the opinion is dominated or pervaded by reliance upon other untrustworthy materials;

3. The extent to which the expert's assumptions have been shown to be unsupported, speculative, or demonstrably incorrect;

4. The extent to which the materials on which the expert relied are within his immediate sphere of expertise, are of a kind customarily relied upon by experts in his field in forming opinions or inferences on that subject, and are not used only for litigation purposes;

5. The extent to which the expert acknowledges the questionable reliability of the underlying information, thus indicating that he has taken that factor into consideration in forming his opinion; [The court added in a footnote that it would limit the applicability of this criterion to close cases of admissibility because an expert who was a true "hired gun" could always surmount it.]

6. The extent to which reliance on certain materials, even if otherwise reasonable, may be unreasonable in the peculiar circumstances of the case.

*Zenith Radio, supra* at 1330. Since the nature and basis of the opinions at issue in this case fall outside the "mainstream" of cases heretofore described, we believe the above factors are a relevant and useful guide for determining whether certain critical portions of the economist's testimony should have been stricken pursuant to Rule 703.

Another rule relevant to this Court's determination as to the admissibility of certain portions of the economist's testimony is Rule 403 of the Federal Rules of Evidence which provides:

Although relevant, evidence may be excluded in its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

It is apparent that when considering the admissibility of expert testimony, Rules 703 and 403 somewhat overlap in that an opinion which is deemed inadmissible under one of the rules may also be deemed inadmissible on the basis of the other. As the court noted in *Zenith Radio, supra* at 1328, after reviewing a number of cases in which expert testimony was excluded by the court,

Even when the issue is plainly admissibility, it is not always clear what rule is used as the basis for the court's decision. For example, as alternative theories, some courts deem an opinion based on unsupported assumptions to be unhelpful to the jury under F.R.E. 702, . . . or to be so misleading as to be excludable under F.R.E. 403, instead of being unreliably based under F.R.E. 703. In any event, all of the above cited cases [see Zenith Radio at pp. 1327–28] refuse to countenance expert testimony based upon what the courts determine to be unreasonable assumptions. Despite the variety of procedural contexts and variety of F.R.E. pigeonholes, they indicate that the assumptions which form the basis for the expert's opinion, as well as the conclusions drawn therefrom, are subject to rigorous examination.

Therefore, in light of the above discussion, this Court will carefully examine the

underlying assumptions, inferences drawn and conclusions reached by the plaintiff's economist. See *Zenith Radio* at 1333. In so doing the Court will consider the various elements heretofore set forth with respect to reasonable reliance under Rule 703 and whether the probative value of the testimony is outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury or by the other considerations set forth in Rule 403.

## B. *The Economist's Testimony Relating to the Size of the Relevant Market and Market Shares*

In his testimony relating to the size of the relevant market and Litton's and American Bearing's respective shares of the relevant market, the economist testified that for the years 1976, 1977, 1978, and 1979 American Bearing had, respectively, market shares of 5%, 5%, 5%, and 17%. Based upon the deposition and trial testimony of some of the buyers of thermal bearings (bearings which operate at 400° F, 3000 pounds p. s. i. with a 3% coefficient of friction) he concluded that American Bearing and Litton were the only sellers of thermal bearings during 1976, 1977 and 1978 and, therefore, that during these years Litton maintained a 95% share of the thermal bearing market. Since a third company entered the market with a 20% share in 1979, Litton was attributed a 63% share for 1979.

To arrive at his calculation of the overall market, and the market shares of Litton and American Bearing, the economist relied on the testimony of Albert Hudson, an expert witness testifying on behalf of American Bearing, that the ratio of the cost of bearings in electrostatic precipitators to the total flange to flange cost of the precipitators is 3% (.003) and that this same ratio exists between the cost of bearings used in baghouses and the total cost of baghouses. The economist used this .3% figure in conjunction with figures supplied by, and testified to at trial, by Robert McIlvaine, another expert witness who testified on behalf of American Bearing. The figures supplied by Mr. McIlvaine represented the total cost for

each year beginning in 1976 of all sales of hot side precipitators and baghouses, that is, precipitators and baghouses operating at temperatures in excess of 250° F. By multiplying Mr. McIlvaine's annual figures for baghouse and precipitator sales by Mr. Hudson's .3% figures, the economist arrived at what he considered to be the size of the relevant market in dollars for thermal bearing sales for each year, beginning in 1976. By comparing American Bearing's total sales of thermal bearings, determined from its invoices, for each year, with the figure purportedly representing total sales of thermal bearings for each year, the economist arrived at American Bearing's share of the relevant market and attributed the remaining share to Litton.

Litton asserts that the economist's method of calculating the overall market was far too speculative in that the testimony of Mr. McIlvaine showed that his figures included precipitators and baghouses which used bearings outside the market defined by the economist. The Court agrees.

The economist testified that in his opinion: there existed a separate definable market for "thermal" bearings which he defined as bearings which operate at 400° F, 3000 pounds p. s. i. with a 3% coefficient of friction; while other types of bearings were occasionally used in baghouses and precipitators, there was a separate market for thermal bearings used in baghouses and precipitators, and; that other bearings were not relevant to the market because they did not have the performance characteristics of thermal bearings. However, in calculating the size of the relevant market, he employed figures which included bearings outside the market which he had defined. Specifically, he relied upon the figures supplied by Mr. McIlvaine showing the dollar value of precipitator and baghouse sales. Mr. McIlvaine had testified that his figures included *all* precipitators and baghouses operating at temperatures in excess of 250° F and thus included "hot side" precipitators operating at temperatures of about 700° F and some experimental precipitators which operate at about 1000° F. Since the record in this case shows that the teflon slide

bearings at issue in this litigation, and around which the economist based his relevant market, sublimate at approximately 620° F, it is clear that these bearings could not have been used in all the precipitators included in Mr. McIlvaine's figures. In addition, the evidence showed that although thermal slide bearings were used in precipitators operating between 250° to 350° F, other types of bearings were also occasionally used. There is nothing, however, in the record to establish what percentage of the baghouses and precipitators included in Mr. McIlvaine's figures contained bearings other than "thermal" bearings.

Since Mr. McIlvaine's figures clearly were not tailored to fit the market which the economist was attempting to quantify, the use of Mr. McIlvaine's figures by the economist could only result in speculation as to the size of the market and the parties' shares of that relevant market. The economist made no effort to adjust his figures to account for the baghouses and precipitators outside the market he had defined, nor was there any reliable evidence in the record upon which he could rely to determine the actual extent of the relevant market. The economist did testify that *Mr. Hudson* had told him that hot-side precipitators would only account for 5% of Mr. McIlvaine's figures.[2] Neither Mr. Hudson nor Mr. McIlvaine had so testified when they were on the stand. This statement was hearsay and is clearly not the type of statement upon which an expert economist should reasonably rely. Furthermore, when asked by the Court whether he had subtracted this 5% figure, he admitted that he performed no arithmetic in his calculations to reduce Mr. McIlvaine's figure or his own figure to reflect the 5% of "hot side" precipitators outside the market.

In conclusion, based on the fact that the economist, in quantifying the size of a narrow and carefully defined thermal bearing market, relied on figures which were shown to include baghouses and precipitators which used bearings outside his defined market and the fact that there was no reliable or admissible evidence upon which the jury or the economist could determine the extent to which bearings outside this market should have been deducted, the Court has determined that the economist's testimony in this respect was misleading and speculative[3] and should have been excluded pursuant to F.R.E. 403. Furthermore, his testimony based upon the alleged out of court statement of Mr. Hudson that only 5% of Mr. McIlvaine's figures included "hot side" precipitators was clearly not admissible under Rule 703 in that it is not the type of evidence that expert economists reasonably rely upon. The 5% figure attributed to Mr. Hudson was objectionable hearsay. Mr. Hudson testified prior to the economist and made no mention of the 5% figure in his testimony and the defendant had no opportunity to cross-examine him concerning it. Rule 703 was never intended to permit an expert in any field to base an opinion upon such basic data which another expert had told him under such circumstances. As Judge Becker pointed out in *Zenith Radio, supra*, one of the factors to be considered by a court in determining the reasonableness of an expert's reliance under Rule 703 is "the extent to which the materials on which the expert relied are within his immediate sphere of expertise." Professor Bowman is well qualified as an economist, however he admitted that he had no expertise concerning the use of bearings in baghouses and precipitators.

According to the transcript, the witness described the foregoing as the "mythology" used by Carborundum in calculating the marketplace. This was probably an error in transposition in that the word actually used was "methodology." However, the former term seems to be more descriptive. In any event, these calculations were a completely inadequate foundation upon which to base a judgment nullifying a $77 million investment.

2. The 5% figure would still not account for occasional use of other bearings in "cool side" precipitators.

3. In *Kennecott Copper Corporation v. Curtiss-Wright Corporation*, 584 F.2d 1195, 1204, n. 10 (2d Cir. 1978), the Court in commenting on a similar type of method used by the plaintiff's expert in calculating the size of the relevant market, stated:

C. *The Testimony of the Economist Relating to Damages*

The economist prepared and testified with respect to a chart, Exhibit P29, which purported to show in three columns: his calculations of the profits American Bearing would have earned from sales in the thermal bearing market from 1976 through 1983 absent Litton's alleged unlawful conduct; his estimate of American Bearing's actual profits through 1980 and its projected profits through 1983 in the thermal bearing market, the latter figure assuming the absence of Litton's alleged unlawful conduct, and; the profits American Bearing lost from 1976 through 1983 as a result of Litton's allegedly unlawful activities.

To obtain the first set of figures showing the profits American Bearing would have earned from 1976 to 1983 in the absence of Litton's alleged unlawful conduct, the economist began by multiplying the total dollar amount of sales of thermal bearings for each year (the figure he had estimated by multiplying Mr. McIlvaine's figure for the sale of "hot" precipitators and baghouses by Mr. Hudson's .3% figure) by his estimate of the percentage of the market American Bearing would have controlled each year (12.5% in 1976; 37% in 1977; 50% for 1978) in the absence of the alleged unlawful conduct. The product of these two figures purported to be the revenues American Bearing would have obtained in the absence of Litton's alleged unlawful conduct. The economist then deducted his estimate of American Bearing's cost of producing the bearings and arrived at his figure for the profits American Bearing would have achieved in the absence of Litton's alleged unlawful conduct.

The economist determined American Bearing's actual profits for the years 1976 through 1980 by adding up American Bearing's invoices for the sales of thermal bearings and deducting from that total his cost estimates for producing the bearings. To calculate American Bearing's lost profits he deducted American Bearing's actual profits from his estimate of the American Bearing's profits absent Litton's allegedly unlawful conduct.

The Court has determined that the economist's testimony with respect to the amount of lost profits should have been stricken for several reasons. First among these is the fact that the initial figure in his calculations (the estimated profits in the absence of Litton's alleged unlawful conduct) was based upon his opinion as to the total dollar amount of sales of thermal bearings for each year, an opinion which this Court has heretofore determined was too speculative and misleading to have been admitted at trial. The use of this figure by the economist as a basis upon which to determine American Bearing's lost profits rendered the result speculative and misleading.

In addition, the economist's testimony and the accompanying exhibits relating to the amount of lost profits are also inadmissible in that they were based on certain unsupported assumptions and, therefore, were unreliably based under F.R.E. 703, and were speculative and misleading in contravention of Rule F.R.E. 403. For example, his projection of American Bearing's fair competition profits for the years 1976–78 was based upon his estimate that American Bearing would have achieved market shares of 12½% in 1976, 37% in 1977 and 50% in 1978. His estimated market shares were based on his oft repeated assumption that American Bearing was offering a better product, with better service, at a lower price. The only support in the record for any of these assumptions is the testimony of Mr. Roman, President of American Bearing, that American Bearing generally sold its bearing at a cost 40% lower than that charged by Litton and could deliver faster. There is no evidence in the record that any comparative tests were performed on the two bearings to determine relative superiority in terms of performance or durability. Furthermore, insofar as the economist assumed that these conditions, in particular that of lower price, would continue to exist as American Bearing's market share increased to 50% and Litton's share declined, his projections fail

to account for any lawful competition and rational economic reactions on the part of Litton. As the United States District Court for the Middle District of Pennsylvania recently stated in addressing post-trial motions which attacked the sufficiency of proof of plaintiff's economic damage model,

> Perhaps the most blatant defect in plaintiff's damage model for lost profits is its failure to account for any lawful competition. Surely plaintiff cannot have expected the defendants to sit idly by while it proceeded to grasp 25% of the road construction market and maintain its roughly 12% of the blacktop production market, when each market began to dry up. As defendants point out, they were well integrated, established firms in the area. To postulate damages on the assumption that they would not individually react by reducing their prices and therefore require plaintiff to further reduce its price, thus reducing its net profit, is absurd. Nor did plaintiff present any evidence from which the jury could, without speculation, determine what the affect of lawful competition would have been and reduce the damages accordingly.

*R. S. E., Inc. v. Pennsy Supply, Inc.*, 523 F.Supp. 954, 966 (W.D.Pa.1981).

Likewise, in *Murphy Tugboat v. Crowley*, 658 F.2d 1256 (9th Cir. 1981), the Ninth Circuit, in commenting on the expert witness' testimony as to a plaintiff's projected share of the market absent the defendant's unlawful conduct, stated

> A reasonable jury could not, however, indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits . . . . In a hypothetical economic construction such as the one underlying Murphy's theory on lost profits, economic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality. Otherwise it will be impossible to keep speculation in check.

658 F.2d at 1262. Similarly, the Third Circuit, in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (1975), granted a new trial in a Sherman Act antitrust case based in part on the ground that the expert, in calculating plaintiff's damages, failed to take into account the effect of sales which would be lost as a result of lawful competition.

■ In this case there was no reason for the economist to assume that if Litton had begun to lose a substantial portion of its market to American Bearing that it would not or could not have reduced its prices in order to remain competitive. The economist, in making his projection as to market shares and profits, did not take into consideration the effect a change in price by Litton would have had on market shares and American Bearing profits. His estimates, therefore, were speculative and misleading as to the damages attributable to Litton's unlawful activities. Thus, the economist's reliance on the unsupported assumptions discussed above rendered his opinion excludable under both Rules 703 and 403.

■ The economist also testified that in order to determine American Bearing's cost of manufacturing its bearings, he went to American Bearing's plant, reviewed the way the bearings were made, looked at the various materials required to manufacture the bearings, examined invoices to determine the costs of the various materials, looked at the accounts of the firm to determine the overhead percentage attributable to the manufacture of the thermal bearings and relied upon a time study prepared by Mr. Furchak, the secretary-treasurer and a stockholder and co-founder of American Bearing. Although Mr. Furchak testified at trial, he did not testify as to the preparation of the time study. On cross-examination, the economist testified that he did not know whether the study had been prepared by Mr. Furchak solely for the purpose of this litigation. Since Mr. Furchak had not testified in court concerning the study and clearly had an interest in the litigation and since the economist did not know the circumstances under which the study was made, it lacked the "necessary safeguards

of accuracy and reliability—the circumstantial guarantees of trustworthiness" set forth in *Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir. 1978). Furthermore, as heretofore pointed out, since under F.R.E. 703 the court is to determine the reasonableness of an expert's reliance on a study upon which he bases his opinion, the court concludes that because of the untrustworthiness of the time study the opinion of the economist based thereon was inadmissible.

In making all of the above determinations regarding the admissibility of the expert's testimony as to damages we have heeded the admonition of the Supreme Court to

> observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969), *quoting Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). However, the nature of the economist's testimony was not such as would allow the jury to determine the plaintiff's damages by a "just and reasonable inference" from the evidence presented. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d at 1353. Instead the economist's testimony could only lead to a damage award based on speculation or guesswork. *See Murphy Tugboat Co. v. Crowley*, 658 F.2d at 1261.

### D. *Summary*

 Having determined, for the reasons heretofore stated, that the Court should have excluded certain critical portions of the economist's testimony, there is no question that there has been a miscarriage of justice insofar as the testimony given by the economist constituted a substantial and integral part of American Bearing's proof of its § 2 Sherman Act claims. The Court will, therefore, grant Litton's motion for a new trial limited solely to American Bearing's § 2 Sherman Act claims, there being no reason to disturb the jury's verdict in favor of Litton on American Bearing's claim of product defamation.