**UNITED STATES of America, Plaintiff,**

v.

**SOUTHERN INDIANA GAS AND ELECTRIC COMPANY, Defendant.**

**No. IP 99–1692–C–M/F.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 11, 2003.

Steven D. Ellis, Environmental & Natural Resources Division, Washington, DC, Thomas E. Kieper, United States Attorney's Office, Indianapolis, IN, for Plaintiff.

Kevin A. Gaynor, Vison & Elkins L.L.P., Washington, DC, John R. Maley, Barnes & Thornburg, Indianapolis, IN, Angila M. Retherford, Evansville, IN, for Defendant.

### ORDER ON DEFENDANT'S MOTION FOR A PROTECTIVE ORDER AND FOR A RULING ON ADMISSIBILITY AND ON PLAINTIFF'S CROSS MOTION TO COMPEL

McKINNEY, Chief Judge.

This matter is before the Court on defendant's, Southern Indiana Gas and Electric Company ("SIGECO"), Motion for a Protective Order and Request for a Ruling on Admissibility, and on the United States' (the "Government"), Cross–Motion to Compel. The Government has brought an enforcement action against SIGECO, alleging various violations of the Clean Air Act ("CAA"). The issues currently before the Court pertain to a census (the "Census") commissioned by several utility companies (including SIGECO) and governmental entities. The Census is offered as an objective study of maintenance practices throughout the utility industry. The parties have fully briefed the matter, and the motion is now ripe for ruling.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The dispute before the Court deals with a variety of issues relating to a Census taken at the behest of SIGECO and other defendants in this enforcement initiative.[1]

---

1. "Enforcement initiative" refers to the Environmental Protection Agency's ("EPA") late 1990s investigation of industry's compliance with various provisions of the CAA. The initia-

The Government alleges that SIGECO has violated and continues to violate a number of the provisions of the CAA, and Indiana's State Implementation Plan. According to the Government, SIGECO triggered CAA permitting requirements when it made "major modifications" in the 1990s at three of its coal-fired, steam electric generating units at Culley Station in Warrick County, Indiana. SIGECO, on the other hand, contends that its projects were not CAA "major modifications" because they qualified for a regulatory exemption called the routine maintenance exemption. 40 C.F.R. § 52.21(b)(2)(iii); 40 C.F.R. § 60.14(e).

The parties have disagreed over the proper definition of the routine maintenance exemption. In a prior order, this Court concluded that the EPA's current interpretation of routine maintenance is reasonable and consistent with its past formulation of the test, which was delineated by the EPA in the Clay Memo in 1988. See Doc. No. 473 (Order on Fair Notice). The EPA interprets the routine maintenance exemption in the following way:

> This interpretation has three hallmarks. First, the exemption applies to a narrow range of activities, in keeping with EPA's limited authority to exempt activities from the Clean Air Act. Second, the exemption applies only to activities that are routine for a generating unit. The exemption does not turn on whether the activity is prevalent within the industry as a whole. Third, no activity is categorically exempt. EPA examines each

activity on a case-by-case basis, looking at the nature and extent, purpose, frequency, and cost of the activity.

Pl.'s Opposition to Def.'s Motion for Summary Judgment on Fair Notice at 1.

Although the routine maintenance exemption does not turn on whether a certain type of project is prevalent within industry as a whole, the frequency with which similar projects take place throughout industry informs this "common-sense" analysis. See Clay Memo. *See also Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 911 (7th Cir.1990) ("WEPCO did not identify, and EPA did not find, even a single instance of renovation work at any electric utility generating station that approached the Port Washington life extension project in nature, scope or extent.") ("WEPCO"). For this reason, the Court believes that the Census, more fully described below, may indeed be relevant if no other provision of the Federal Rules of Evidence bars its admission.

## A. THE CENSUS

In an effort to collect data about how often certain projects occur at electric generating units throughout the country, SIGECO hired a number of consulting/survey firms [2] to organize a questionnaire to be sent to companies in the utility industry. Def.'s Ex. E. The questionnaire, consisting of 32 questions, was sent to all coal-fired, steam electric generating units in the United States with a capacity of 46 megawatts or more. Def.'s Motion for

---

tive led to the filing of this suit against SIGECO in 1999, as well as a number of other actions filed against utility companies around the same time. The defendants include: Illinois Power, Tampa Bay Electric, Cinergy, the Tennessee Valley Authority, Ohio Edison, American Electric Service Company, and Duke Energy Corporation. The Environmental Appeals Board issued a decision in the Tennessee Valley Authority case, and that

case currently is on appeal before the Eleventh Circuit. The only case that has gone to trial at this point is the Ohio Edison case.

**2.** The following firms played a role in administering the Census: Analysis Group/Economics, PricewaterhouseCoopers LLP, and RMB Consulting. Ex. B in Support of Pl.'s Reply Memo.

Protective Order at 1. There are 964 such units in the country, owned and operated by approximately 106 companies. *Id.*; Pl.'s Memo in Opposition at 4. A response was received from 449 units. *Id.* Of those 449, 14 contained apparent anomalies, leaving 435 useable responses. *Id.*

Recipients of the Census were told that their responses to the questionnaire would remain confidential. Def.'s Ex. C. Accordingly, each unit in the population was given a unique identification code known only to the consultants who conducted the Census. Def.'s Ex. E. SIGECO plans to call one or more expert witnesses (including Dr. Dennis J.Aigner and Dr. Donald R. DeLuca) who base their opinions in whole or in part on the Census.

The consultants included a cover letter with the questionnaire to explain the reasons for the Census. The letter stated in relevant part:

> I am writing to ask for your participation in an important study regarding certain power plant maintenance activities in the coal-fired, steam electric generating industry. As you may know, the U.S. Environmental Protection Agency ("EPA") has commenced what it has described as an "enforcement initiative" against the electric utility industry under the federal Clean Air Act. A major issue is this initiative is whether various companies have made "major modifications" to their power plants that potentially could have triggered certain Clean Air Act permitting obligations.
>
> EPA's regulations provide that "routine maintenance, repair and replacement" activities undertaken at covered facilities are not "major modifications" that trigger permitting obligations under the Clean Air Act. To our knowledge, however, no comprehensive review of the industry's maintenance practices has yet been completed. To remedy this deficiency, my firm (Analysis

Group/Economics) has been retained by certain of the targeted companies to develop and distribute a questionnaire, with the assistance of RMB Consulting and Pricewaterhouse Coopers LLP, that is designed to document maintenance activities in the coal-fired, steam electric generating industry.

Def.'s Ex. C.

On November 29, 2000, the week before the questionnaire materials were sent to the 964 electric generating units, the general counsels for the companies that commissioned the Census sent a letter the CEOs of all 964 generating units. The letter provided, in relevant part:

> As you probably know, the U.S. Environmental Protection Agency (EPA) has commenced what it has described as an "enforcement initiative" against the electric utility industry under the federal Clean Air Act ... The United States on behalf of EPA has named six of our respective companies as defendants in civil actions filed under the Act, while numerous other electric utilities have received either formal information requests from EPA pursuant to Section 114 of the Act, 42 U.S.C. § 7414, or administrative enforcement orders pursuant to Section 113, 42 U.S.C. § 7413. All of the cases included in EPA's enforcement initiative focus on various maintenance activities undertaken at coal-fired power plants throughout the U.S. To develop a factual record as to industry maintenance practices, we have commenced ... a complete investigation, or "census," of all coal-fired boilers in the United States. A "Power Plant Maintenance Questionnaire" has been prepared expressly for this purpose. (A sample copy of the Questionnaire has been enclosed for your review.)
>
> Every reasonable effort will be made to keep strictly confidential the identities

of the respondents liked to their specific responses. Although we do not believe that the identities of the respondents linked to their responses should be discoverable, it is possible that a court could disagree and order this. Please know that we will resist any such effort strenuously.

Our hope and experience is to have a report prepared by our expert consultants which compiles and analyzes all of the responses to the Questionnaire. In appreciation for your time in completing the questionnaire, your company will receive a copy of the final report for this study.

You will be contacted in the next few days to follow up on this letter. In the meantime, please feel free to contact any of us if you have questions or would like additional information.

Ex. B in Support of Pl.'s Reply Memo.

## B. MOTIONS BEFORE THE COURT

As stated above, unique identifying codes were used to assure confidentiality (i.e., the responses could not be linked to the actual responding units). The Government requested that SIGECO provide it with the codes so that it could depose a number of the respondents to assure the reliability of the Census data. SIGECO refused to specifically identify the respondents, and filed this Motion for a Protective Order and for a Ruling on Admissibility. Recognizing that the 435 responses are out-of-court statements offered for their truth, SIGECO submits that the Census is admissible pursuant to FED. R.EVID. 807 (the residual hearsay rule), and contends that Rule 807 only requires evidence that the Census was designed and administered according to generally accepted survey principles. Thus, SIGE-

CO requests that the Court enter a Protective Order under Rule 26 directing that the unique, identifying information about each Census respondent need not be produced.[3] In addition, SIGECO seeks a ruling that the confidentiality of the identities of the Census respondents will not bar admissibility of the Census results under FED.R.EVID. 807.

The Government maintains that the information sought to be protected is not confidential, and that Rule 807 mandates disclosure of the names and addresses of the persons making hearsay statements. It also maintains that the Census is inadmissible because, *inter alia,* the Census takers and Census respondents knew the questionnaire was being circulated for this litigation; the respondents are either defendants in this enforcement initiative, or coal-fired, steam electric generating units that may be subject to enforcement actions for similar violations; and the survey sought information about activities that may have taken place up to sixty years ago. The Government's concerns about the reliability of the survey are well-taken, and the Court will now address whether or not the Census is admissible.

## II. *EVIDENTIARY STANDARDS FOR ADMISSION OF CENSUS*

The Second Circuit recently analyzed the issues facing district courts when considering the admissibility and/or weight of surveys in a thorough and thoughtful opinion. *See Schering Corp. v. Pfizer Inc.,* 189 F.3d 218 (2d Cir.1999). For a long time, courts refused to admit surveys at all:

> In the first half of the century, surveys were generally regarded as inherently untrustworthy because they contained hearsay, or out of court statements offered to prove the truth of matters as-

---

**3.** Because the Court ultimately finds that the Census is inadmissible hearsay, SIGECO's re-

quest for a Protective Order is moot.

serted. *See, e.g., DuPont Cellophane Co. v. Waxed Prods.*, 6 F.Supp. 859, 884 (E.D.N.Y.1934) (refusing to admit survey because court could not "see how plaintiff could even test the facts, as it had no opportunity for cross-examination of those who were supposed to have answered the questions"); *Elgin Nat'l Watch Co. v. Elgin Clock Co.*, 26 F.2d 376, 376–77 (D.Del.1928) (refusing to admit survey, even as basis for expert opinion, because survey collected hearsay).

*Schering*, 189 F.3d at 225.

However, due to a variety of factors, such as the efficiency of a random sampling poll and the increased level of sophistication and reliability of surveys in general, courts are increasingly receptive to admitting and considering survey data in certain cases. For example, consumer survey polls are frequently accepted by courts in trademark cases to show likelihood of consumer confusion. *See Simon Prop. Group v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1038 (S.D.Ind.2000) (collecting cases). Polls also have been used in antitrust and defamation cases. *See, e.g., Amer. Bearing Co. v. Litton Indus., Inc.*, 540 F.Supp. 1163, 1174–75 (E.D.Pa. 1982), *aff'd*, 729 F.2d 943 (3rd Cir.1984), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984) (antitrust case); *Ollman v. Evans*, 713 F.2d 838 (D.C.Cir. 1983), *aff'd on rehearing*, 750 F.2d 970 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) (defamation case). "Surveys of other types have occasionally been admitted for other limited purposes. *See e.g., Keith v. Volpe*, 858 F.2d 467, 479–81 (9th Cir.1988) (admitting survey to show statistics concerning respondents' race, income and housing preferences); *Debra P. v. Turlington*, 730 F.2d 1405, 1408, 1412–14 (11th Cir.1984) (admitting survey to show 'whether the teacher[s] surveyed had skills tested on the SSAT–II and if so, whether that instruction had been sufficient for a student to master the skills.')." *Schering*, 189 F.3d at 225.

In *Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir.1978), the Third Circuit summarized the modern view of the hearsay rule as it applies to polling evidence:

> While some polls are not hearsay in that they are admitted to show the beliefs or attitudes of the respondents (as opposed to the truth of the respondents' answers), other polls are unquestionably hearsay.
>
> Such hearsay polls are not necessarily inadmissible as evidence in that they may fall into a recognized class exception to the hearsay rule, as, for example, when they involve a present sense impression or a presently existing state of mind. If a survey or poll does not fit into one of the class exceptions to the hearsay rule, it may nevertheless be admissible under FED.R.EVID. 803(24) [now codified as Rule 807]. In other words, the survey is admissible if it is material; if it is more probative on the issue than any other evidence; and if it has "circumstantial guarantees of trustworthiness" equivalent to those of the class exceptions ... The proponent of such evidence, of course, has the burden of establishing these elements of admissibility.

*Pittsburgh Press*, 579 F.2d at 757–58.

▮ SIGECO acknowledges that the Census is hearsay. However, SIGECO maintains that the Census should be admitted under the residual hearsay rule.[4] The rule provides:

---

4. Of course, an expert may base his or her opinion on facts or data that would otherwise be inadmissible. FED.R.EVID. 703. However, there is important caveat to that rule—the expert's opinion is admissible only if the un-

A statement not specifically covered by Rule 803 or 804 *but having equivalent circumstantial guarantees of trustworthiness,* is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

FED.R.EVID. 807 (emphasis added). Thus, to be admissible under Rule 807, the evidence must fulfill five requirements: (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice. *See United States v. Hall,* 165 F.3d 1095, 1110 (7th Cir.1999) (citing *Moffett v. McCauley,* 724 F.2d 581, 583 (7th Cir. 1984)). The residual hearsay rule was intended to "be used very rarely, and only in exceptional circumstances." See S.Rep. No. 93–1277, at 36 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7062.

█ Rule 803 and Rule 804, referred to above in the text of Rule 807, are the hearsay exception rules. Statements ad-

mitted under Rule 807 must have the "circumstantial guarantees of trustworthiness" that justify the traditional hearsay exceptions. *See Schering,* 189 F.3d at 233 ("The traditional exceptions to the hearsay rule ... provide the benchmark against which the trustworthiness of evidence must be compared in a residual hearsay analysis."). It is important to note that all of the traditional hearsay exceptions minimize one or more of the four hearsay risks: (1) insincerity; (2) faulty perception; (3) faulty memory; and (4) faulty narration. *See id.* For example:

> [P]resent sense impressions ... do not suffer from the risk of faulty memory because they are made at or near the time of impression. These statements also express knowledge based on direct sensory perception ... Similarly, statements falling under Rule 803(3)'s exception for presently-existing states of mind rarely suffer from the risks of faulty memory because they are made when the declarant is in the relevant state, and they bear minimal risk of faulty perception because speakers generally know their own states of mind.

*Id.* (citations omitted).

Thus, the Court must determine the relative degree to which the census is prone to the hearsay risks, and if any of the risks are minimized by circumstantial guarantees of trustworthiness. *See id.* If the Census is sufficiently trustworthy, then the Court must consider if it is necessary. FED.R.EVID. 807 ("the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."). *See also Schering,* 189 F.3d at

derlying facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." *Id. See also Baumholser v. Amax Coal Co.,* 630 F.2d 550, 553 (7th Cir.1980) ("[The testifying expert] was entitled to rely

on hearsay evidence to support his opinion, so long as that evidence was of a type reasonably relied upon by other experts in the field."). SIGECO has made no showing in this regard. Nor can it because this survey was unprecedented.

238 ("In the context of survey evidence, the interests of justice and the general purposes of the rules of evidence are generally best served by the admission of surveys that meet these two criteria ... *necessity and trustworthiness.*") (emphasis added).

### III. *DISCUSSION*

#### Trustworthiness of Census

The parties strongly dispute whether or not the Census is sufficiently trustworthy to be admitted under Rule 807. According to the Government, the following factors indicate that the Census is plagued by hearsay risks that undermine its reliability, and mandate its exclusion from evidence:(1) the high level of attorney involvement in designing and conducting the Census; (2) the cover letter alerted the Census takers and Census respondents that the Census questionnaire was being circulated for this litigation; (3) many of the respondents are either defendants in this or related actions by the Government, or are coal-fired, steam-electric generating units that could be subject to an enforcement action for similar violations; and (4) the Census sought information about activities that may have taken place up to sixty years ago.

SIGECO contends that it is premature for the Court to make a ruling on the admissibility of the Census until all Census-related discovery is complete. SIGECO further contends that even if the Government has created an issue as to the trustworthiness of the Census, such concerns properly go to the weight of the evidence, not its admissibility. In support of its argument, SIGECO cites this quotation from the Seventh Circuit:

> While there may be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, ... such situations will be rare and the present case

is not among them. We believe any shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir.1993) (citations omitted). SIGECO also objects to the Government's focus on attorney involvement as a factor that undermines the trustworthiness of the Census. Finally, SIGECO maintains that the census recipients' awareness of the purpose of the survey, standing alone, does not render it untrustworthy. Def.'s Surreply to Pl.'s Cross–Motion to Compel.

▮ First, the Court disagrees with SIGECO's argument that it is premature for the Court to determine if the Census is admissible. The trial date is fast approaching, and discovery is closed in this case. Although there are still a few discovery motions pending before the Court, this is the only motion that involves the Census. The Government properly raised the issue in its Memo in Opposition to SIGECO's Motion for a Protective Order, and the Court allowed SIGECO to file a surreply on the issue. The issue is ripe for resolution.

Second, the Court agrees with the Government that the Census is prone to substantial hearsay risks. Perhaps the most troubling hearsay risk implicated by the Census is the risk of insincerity. The cover letter sent to each CEO not only explained that the Census questionnaire sought data relevant to the EPA's enforcement initiative, it cited the regulatory defense to which the Census would relate: the routine maintenance exemption. There is little doubt that the respondents (and the recipients that chose not to respond) understood which responses would be helpful to the defendants, and which would be harmful.

All of the recipients were and are subject to the CAA—in other words, the

companies are all potential defendants in future suits like this one. In fact, the Government has filed suit against or issued an administrative order on consent against companies that own or operate 305 coal-fired, electric generating units (of the 964 recipients and 435 respondents), and all 305 were recipients of the questionnaire. Pl.'s Memo in Opposition at 21. Thus, it is possible that over seventy percent of the respondents (305/435) had an immediate, direct interest in the results of the Census. General counsel for SIGE-CO (and counsel for other defendants in the enforcement initiative) reminded the questionnaire recipients of their common interests in a November 2000 letter:

The United States on behalf of EPA has named six of our respective companies as defendants in civil actions filed under the Act, while numerous other electric utilities have received either formal information requests from EPA pursuant to Section 114 of the Act, 42 U.S.C. § 7414, or administrative enforcement orders pursuant to Section 113, 42 U.S.C. § 7413.

Pl.'s Ex. B in Support of Reply. In return for the time spent completing the questionnaire, respondents were promised a copy of the final report of the study. *Id.* The respondents are sophisticated entities with millions of dollars at stake if they are found to be in violation of the CAA. The risk of insincerity in the responses is very high.

Other courts have expressed similar concerns about admitting surveys based on responses from interested parties that are informed of the purpose of the survey. In *Pittsburgh Press*, the plaintiff, a Press Club (the "Club"), sought a refund of taxes paid to the Internal Revenue Service. *See Pittsburgh Press*, 579 F.2d at 758–59. The Club had to establish that its facilities were used primarily for the benefit of Club members. *See id.* Accordingly, the Club

surveyed its members to ask them about their use of Club facilities. *See id.* As in this case, the Club sent a cover letter that explained the precise nature of the litigation to the interested respondents. *See id.* The *Pittsburgh Press* court found that those circumstances undermined the reliability of the survey:

The respondents, who were all Club members and thus interested in the litigation, were told the precise nature of the litigation and the purpose of the survey. They consequently knew which responses would be helpful to [the Club], and conversely, which would be harmful ... The respondents were all interested in [the Club's] prevailing in the lawsuit. Yet they were expressly advised about the nature of the litigation and the survey, as well as which answers would benefit the Club.

In sum, the survey admitted by the district court was neither objective, scientific, nor impartial.

*Id.* at 759. *See also Schering*, 189 F.3d at 233–34 (noting that proper survey methodology can help reduce the classic hearsay dangers, and adding that, "[i]n particular, the risk of insincerity can ordinarily be reduced if the interviewers and those questioned lack knowledge of the litigation and the purpose of the survey."); *Lutheran Mut. Life Ins. Co. v. United States*, 816 F.2d 376, 378–379 (8th Cir.1987); *Gibson v. County of Riverside*, 181 F.Supp.2d 1057, 1066–69 (C.D.Cal.2002).

The circumstances surrounding this Census are more akin to those in *Lutheran Mutual Life, Pittsburgh Press*, and *Gibson*, than to the more common cases involving consumer survey polls in the trademark context. *Compare Lutheran Mut. Life Ins.*, 816 F.2d at 378–79 (excluding survey in part because the persons conducting the survey and many of the respondents knew about the purpose of the survey), *Pittsburgh Press*, 579 F.2d at

758–59 (same), *and Gibson,* 181 F.Supp.2d at 1066–69 (excluding survey in part because "the recipients of the survey were informed of the purpose of the survey and reminded that they were the beneficiaries of the survey."), *with Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 954 (7th Cir.1992) (reversing district court's exclusion of consumer confusion survey), *and James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 278 (7th Cir.1976) (crediting consumer survey because it was "fairly and scientifically conducted by qualified experts and *impartial* interviewers") (emphasis added). The Court agrees with SIGECO that the problems with the surveys in cases like *Pittsburgh Press* and *Lutheran Mutual Life* were more egregious than the flaws associated with the Census in the instant case. The main distinguishing characteristic is that SIGECO employed experienced professionals to conduct the Census; whereas, the surveys in *Pittsburgh Press* and *Lutheran Mutual* were riddled with technical problems that were likely caused by the lack of expertise of the survey designers. However, in the Court's view, the presence of experienced consultants to conduct a survey does little to mitigate the risk of insincerity in response when every respondent is either a party to the existing litigation, subject to an administrative order on consent, or a potential litigant for similar violations. What this case has in common with cases like *Pittsburgh Press* and *Lutheran Mutual* was just as important to those courts' rationales for excluding the surveys: interested respondents that could be harmed/benefitted from the results of the survey, and the respondents were informed that the survey was connected to litigation.

Surveys admitted in the trademark context, on the other hand, do not suffer from these infirmities. *See, e.g., Stuart Hale,* 1 F.3d at 618. The surveys useful in trademark cases are public opinion/consumer survey polls, which often can be admitted under the specific hearsay exceptions without out resort to the residual hearsay rule. In the trademark context, strong justification exists for admitting surveys: the efficiency of taking a poll of a random sampling of respondents rather than parading in numerous out-of-court declarants to testify in court; respondents give an immediate answer to questions (minimizing hearsay risks of faulty memory and insincerity); respondents do not have an interest in the litigation (lowering risk of insincerity); and respondents are unaware that the survey is connected to litigation (further lowering risk of insincerity). As the Second Circuit recently observed, "[t]he use of surveys is ... far more prevalent in trademark law than in most other areas." *Schering,* 189 F.3d at 225. *See also Zippo Mfg. Co. v. Rogers Imports,* 216 F.Supp. 670, 682–83 (S.D.N.Y.1963) ("[The] danger of [insincerity] is minimized by the circumstances of [a] public opinion poll in which scientific sampling is employed, because members of the public who are asked questions about things in which they have no interest have no reason to falsify their feelings."). Simply stated, the justifications that bolster the trustworthiness of surveys in the trademark context do not exist in the present case.

Another hearsay risk implicated by the Census is the risk of faulty memory. The Census requests that the respondents provide information about projects that took place between 1940 and the present. It may be that many companies no longer have records to respond about projects so far in the past. Moreover, for a variety of reasons, former employees with knowledge about past projects may not have been available to assist with the questionnaires. If those reasons or other contingencies prevented recipients from obtaining reliable information about past maintenance projects, it is unclear if the recipient would choose not to respond at all, or to estimate

the proper response. These problems undermine the trustworthiness of the Census.

The Court also has serious reservations about the level of attorney involvement in the design and administration of the Census. The Third Circuit highlighted this concern in *Pittsburgh Press:*

> It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. *Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the Respondents should be similarly unaware.*

*Pittsburgh Press,* 579 F.2d at 759–60 (emphasis added). *See also Delgado v. McTighe,* 91 F.R.D. 76 (E.D.Pa.1981) (concluding that a survey lacked "circumstantial guarantees of trustworthiness" due to lawyers' active involvement in design and administration of survey); *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Laboratories,* 532 F.Supp. 1040, 1058 (D.N.J.1980) (excluding survey in part because "plaintiffs' attorneys were involved in designing the questions that were to be asked ... This conflicts with the admonition in *Pittsburgh Press* that surveys be designed without guidance from lawyers.").

SIGECO emphasizes that many courts and commentators now recommend "some attorney involvement in the survey design ... to ensure that relevant questions are directed to a relevant population." Def.'s Ex. A, Reference Manual on Scientific Evidence. The Court agrees that some level of attorney involvement in the design of a survey, preferably by attorneys from both sides, may be desirable rather than objec-

tionable. The goal is a legally and factually relevant survey, and attorney involvement in that regard may be necessary.

However, the Court's concern in the instant case is the *degree* of attorney involvement by SIGECO's lawyers, and SIGECO's lawyers' participation in carrying out the survey. The enforcement initiative lawyers and consultants worked together to design the Census. Numerous emails were exchanged between the two groups discussing the substance of the questions, the proper universe of the recipients, and other issues related to the Census. See Exs. attached to Pl.'s Response to Def.'s Surreply. The contract between the defendants and the consultants made it clear that the defendants' lawyers were in charge: "It is understood that the services to be performed by RMB [Consulting] are being undertaken at the direction of counsel on behalf of the Defendants in connection with the development of the Defendants' legal position in anticipation of litigation." Ex. 1 to Pl.'s Response to Def.'s Surreply. Obviously, the consultants were well-informed about the litigation. This type of relationship makes the consultants an extension of the legal team rather than outside, objective experts, and raises the concerns expressed by the Third Circuit in *Pittsburgh Press.*

The attorney involvement was not limited to issues that arose prior to the distribution of the Census questionnaire. Enforcement initiative attorneys spoke with some questionnaire recipients about the survey, and advised the consultants on how to respond to statements made by the recipients. Ex. 5 to Pl.'s Response to Def.'s Surreply. Attorneys also participated in the review of the Census data. Exs. 6–8 to Pl.'s Response to Def.'s Surreply. This involvement exceeds what was necessary to assure that the questionnaire was legally relevant.[5]

5. The Court also is troubled by that fact that counsel for the companies in the enforcement

SIGECO also maintains that questions about the reliability of the survey go to the weight of the evidence rather than to its admissibility. There does appear to be some agreement that technical flaws in a survey normally only impact the weight accorded to survey data. *See, e.g., Stuart Hale*, 1 F.3d 611, 618 (7th Cir.1993) (holding in a trademark case that the "shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact."). *See also Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.1988) (technical inadequacies in a survey bear on the weight of the evidence, not its admissibility). However, in the Court's view, the deficiencies associated with the Census are not mere technicalities. Rather, the infirmities are substantial and fundamental, rendering the Census inherently untrustworthy. Though a safer route for the Court might be to admit the Census and then assign it very limited weight due to its flaws, this would lead to a waste of time that conflicts with principles underlying the Federal Rules of Evidence. FED. R.EVID. 403. *See also Schering*, 189 F.3d at 234 ("Because the residual hearsay rule requires an initial trustworthiness determination before it will allow for the admission of evidence, all of these considerations, including those of methodology, will affect not only the weight but also the admissibility of surveys offered in the present circumstances, i.e., when none of the other traditional hearsay exceptions apply."); *Simon Prop. Group*, 104 F.Supp.2d at 1039 ("The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will create at trial.").

Rule 807 requires that the Census have "circumstantial guarantees of trustworthiness" equivalent to those of the class exceptions. FED.R.EVID. 807. Rather than having unique guarantees of trustworthiness, the Census suffers from numerous deficiencies that undermine its reliability. *See Baumholser*, 630 F.2d at 552 ("To qualify a study or opinion poll for admission into evidence, there must be a substantial showing of reliability."). SIGECO has failed to carry its burden to establish that the Census is trustworthy, an element that the Seventh Circuit has called "critical to the admission of a hearsay statement under [Rule 807]." *Hall*, 165 F.3d at 1110 (citing *Moffett*, 724 F.2d at 583 and *United States v. Romo*, 914 F.2d 889, 896 (7th Cir.1990)). Accordingly, the Court excludes the Census as hearsay.

## IV. *CONCLUSION*

For the reasons discussed herein, the Court excludes the Census from evidence in this case. Accordingly, the Court **DENIES** SIGECO's Motion for a Protective Order and a Ruling on Admissibility as moot. The Court **GRANTS** the Government's Cross–Motion to Compel to the extent that it requested a ruling that the Census is inadmissible. The Government's request that the Court compel production of the unique identifying codes of the respondents to the Census is moot.

initiative sent a letter about the Census to the CEO of every company three days prior to the arrival of the Census questionnaire. There may have been innocuous reasons for the letter (i.e., encouraging participation by assuring confidentiality), but sending a letter to the CEOs shortly before the Census also could be interpreted as pressure or guidance.