**SIMON PROPERTY GROUP L.P., a Delaware limited partnership, Plaintiff,**

**v.**

**MYSIMON, INC., a California corporation, Defendant.**

**No. IP 99–1195–C H/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

June 7, 2000.

Daniel L. Boots, Bingham Summers Welsh & Spilman, Indianapolis, IN, Ronald A. Sandler, Jones Day Reavis & Pogue, Chicago, IL, Terrence M. Murphy, Jones Day Reavis & Pogue, Dallas, TX, for Simon Property Group, L.P.

Joel Tragesser, Locke Reynolds, LLP, Indianapolis, IN, for MySimon, Inc.

## ENTRY ON PLAINTIFF'S MOTION IN LIMINE

HAMILTON, District Judge.

Plaintiff Simon Property Group, L.P. ("SPG") owns and operates retail shopping malls all over the United States. Defendant mySimon operates a comparative shopping information service on the World Wide Web. Its service features a cartoon character known as "Simon" who personifies the work done by mySimon's computer programs to gather and organize information from the World Wide Web for a shopper. SPG has sued mySimon, Inc. for federal trademark infringement and related claims. SPG's central claim is that mySimon, by using the name "mySimon," the web address *www.mysimon.com*, and the "Simon" character, infringes SPG's federal trademarks using the name "Simon."

The case is now before the court on SPG's motion in limine asking the court to find in advance of trial that the results of proposed consumer surveys on possible consumer confusion will be admissible at trial. See *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 386 (7th Cir. 1976) (commending similar pre-trial procedure in trademark infringement case).[1]

1. A later amendment to Fed.R.Civ.P. 52 su- perseded an unrelated portion of the *Union*

SPG originally filed its motion in limine on February 8, 2000, after mySimon had rejected an informal request for agreement on the proposed survey techniques. SPG's proposed survey was designed by its retained expert on market research, Dr. Carl Block. MySimon opposed the motion and offered the testimony of its retained expert on market research, coincidentally named Dr. Itamar Simonson, who criticized Dr. Block's proposal on several grounds. The court set a hearing. SPG then modified its proposed surveys in response to mySimon's criticisms. The day of the hearing, March 15, 2000, SPG served a new affidavit from Dr. Block, another affidavit from a new retained expert, Dr. Robert C. Sorensen, and a series of new exhibits that became the focus of the hearing. SPG had served the new affidavits and exhibits on mySimon's counsel about 30 minutes before the hearing. The new affidavits and exhibits corrected some of the more obvious and superficial flaws in plaintiff's original proposal. See

SPG Reply Br. at 2–3 (summarizing changes).

The court heard argument and some evidence at the hearing. However, SPG's last-minute changes to the proposal and its new evidence were so substantial as essentially to rewrite the motion, so the motion could not be decided fairly at that time. At the end of the hearing, the court gave SPG an opportunity to file a revised motion, to place in essence its strongest proposal on the table. Two weeks later, SPG filed a renewed motion that presented some additional evidence and further refinements of its proposed surveys.

That renewed motion has been fully briefed and is now ripe for decision. The record on the motion includes all of the original motion and opposition papers and the argument and evidence presented at the hearing. The court has also considered the evidence developed on plaintiff's motion for a temporary restraining order. For the reasons explained below, SPG's motion in limine is denied.[2]

---

Carbide opinion. See *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985).

2. SPG has repeatedly complained that mySimon has refused to cooperate in designing a survey acceptable to both sides, as the Seventh Circuit suggested in *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d at 386. SPG asks: "How many times must Simon revise and re-propose its surveys to mySimon, only to be met with the same indiscriminate rejections?" SPG's Renewed Reply Br. at 2. The court finds no evidence of bad faith on mySimon's part. The *Union Carbide* procedure assumes that one party will make a reasonable initial proposal. That has not happened here.

As explained below, SPG's proposed survey methods are plainly built upon significant distortions of the reality of the marketplace and persistent refusals to use basic controls to identify legally relevant confusion. The proposed surveys amount to nothing more than meaningless word association and memory tests. SPG's complaint about mySimon's refusal to offer alternatives is similar to that of a party who serves a grossly overbroad document request—"produce all documents your business generated from 1995 to the pres-

ent"—and then complains when the opponent objects and declines to propose on its own a narrower request to "negotiate" the parties' dispute. See Sorensen Decl. I ¶ 9 ("It is my understanding that the three survey proposals *outlined* in Dr. Block's [first] declaration *were intended to form the basis for discussion* whereby a design for a survey or surveys sponsored by the Plaintiff would emerge.") (emphasis added).

As a result of SPG's decision to submit the obviously flawed "basis for discussion" as its original motion, both the court and mySimon were required to expend unnecessary effort dealing with flaws that SPG surely recognized or should have recognized, and which it then corrected. Given the numerous and obvious flaws in the initial proposal, SPG's complaint that it had to spend extra time and money because mySimon would not cooperate in this process rings hollow. Moreover, the burden of proof on likelihood of confusion is on SPG, and this case remains an adversarial proceeding in which SPG is essentially trying to shut down mySimon's business. Cf. Sorensen Decl. I ¶ 12 ("Telling what is wrong with something, even when such criticism is valid and justified, does not fulfill a purpose of reaching any kind of consensus for a survey plan that Defendant would consider valid and feasible. . . .").

*The Commercial Context of This Case*

Before digging into the details of the proposed surveys, some background may be helpful on the nature of these two parties' businesses, essential characteristics of the Internet, and the nature of the marks in question and their use on the Internet.

Plaintiff SPG builds, owns, and operates shopping malls throughout the United States. Its malls are so numerous and popular that roughly half the United States population will visit a Simon mall at least once this year. SPG is well-known among retailing concerns. Its customers are the retailers who operate stores in its malls. SPG is less well-known to the general public, including those who shop its malls. In 1999, however, SPG launched a "branding" campaign in which it substantially increased its spending on advertising to the general public to enhance awareness of the Simon name as the owner and operator of popular and successful shopping malls.

SPG has also been expanding its presence on the Internet. It has established web sites to provide information about its malls and the retailers who operate brick-and-mortar stores in them. Its web sites also feature services and promotional items like gift certificates for stores in SPG malls.

In contrast to SPG's brick-and-mortar malls all over the United States, defendant mySimon provides its services only over the Internet. MySimon offers Internet users a free comparative shopping service. The computer programs available through mySimon enable a shopper to search thousands of web sites offering goods and services for sale and then to compare the prices and other features offered by competing sellers. For example, a consumer interested in shopping for a computer, a pair of skis, or a book can access the mySimon web site and type in appropriate search terms. MySimon responds with a list of web sites offering to sell the desired item. The list includes comparative pricing information and direct "hyperlinks" to each seller's "cash register" or "buy" page on the web (thus saving time by bypassing a number of preliminary web pages in the seller's site). MySimon offers various on-line shopping guides. It also sells gift certificates. MySimon has been in business only since 1998, but it was in business and received considerable media attention well before SPG launched its "branding" campaign aimed at the general public.

In a very general sense, both SPG and mySimon offer shopping information over the Internet, but they do so in different ways and for incompatible purposes. MySimon offers comparison shopping, making it easy for a consumer to compare prices and selections at thousands of on-line retailers to find the best deal. SPG offers information about its brick-and-mortar malls and the retailers who operate stores in those malls. Its goal is to increase the number of consumers shopping at those malls. The retailers in SPG malls do not necessarily benefit from a convenient comparative shopping service like mySimon, which allows consumers to avoid brick-and-mortar malls entirely and to find very quickly the best available price for a particular product on the Internet.

These two parties do not compete directly with one another, but there is some degree of what can be called competitive proximity. At that general level, both offer shopping information over the Internet. Both offer gift certificates. In addition, the commercial world is changing quickly, and since this case was filed, SPG has been expanding its Internet presence to offer new forms of Internet shopping, while mySimon has also been expanding its offerings. There is a potential here for what might be called competitive convergence between these two very different businesses.

The Internet plays a critical role in the issues in this case, primarily because both parties use the name "Simon" in their Internet sites. As trademark law has developed in the United States, geographic boundaries and differences between product markets have imposed significant lim-

its on the rights of trademark owners. For example, different companies can use very similar or identical trademarks if they use them in different geographic areas or in connection with products that do not compete with one another, at least if consumers are unlikely to believe there is any association between them. Professor McCarthy has asked rhetorically whether "Massey–Ferguson" lipstick or "Caterpillar" cosmetics would infringe those well-known trademarks. 4 McCarthy on Trademarks § 24:8 at 24–19 (4th ed.1999). Similarly, a "Smith's Supermarket" in Florida could not prevent another "Smith's Supermarket" in Montana from using the same name. See, *e.g.*, *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.*, 433 F.2d 99 (7th Cir.1970); *Fairway Foods v. Fairway Markets*, 227 F.2d 193 (9th Cir. 1955).

The Internet poses new challenges to trademark law, in large part because it erases geographic boundaries and blurs the boundaries between different products and services. As the evidence here shows, a search of the Internet for "simon and shopping" can turn up thousands of web sites that include sites for SPG's malls and for mySimon's comparative shopping service. But the same search also turns up sites for Simon & Schuster publishing, a Simon's clothing store in Massachusetts, a pizza parlor in Oklahoma called Simple Simon's, retail connections for singers Paul Simon and Carly Simon, glassware and ceramics from Simon Pearce in Vermont, and so on. In this respect, at least, encounters with trademarks on the Internet are different from those in the grocery store or hardware store that are perhaps the archetype for the consumer survey models developed for trademark law.

The Ninth Circuit recently observed:

Our ever-growing dependence on the Web may force us eventually to evolve into increasingly sophisticated users of the medium, but, for now, we can safely conclude that the use of remarkably similar trademarks on different web sites creates a likelihood of confusion amongst Web users. The ever-growing number of tentacled conglomerates may force us to conclude that even one hundred and one products could all be sponsored by a single consortium.

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206–07 (9th Cir.2000). The challenge for the courts is to recognize that the Internet has erased these boundaries while still respecting both trademark rights and the *limits* of those rights. The huge volume of information available on the Internet can be both a source of confusion and a means for avoiding that confusion. Consumer surveys dealing with confusion on the Internet must keep in mind these important features of the Internet experience.

Another important aspect of this case is that "Simon" is a fairly common surname. Such trademarks are generally weaker than coined trademarks. See generally 2 McCarthy on Trademarks § 13:2 at 13–3 (4th ed.1997). In a case involving the name "Scott," the Third Circuit explained: "Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978) (finding that Scott Paper was not entitled to bar use of name "Scott" for household cleaning product); see also *S.C. Johnson & Son v. Johnson*, 116 F.2d 427, 430 (2d Cir.1940) ("When all is said, if a man allows the good will of his business to become identified with a surname so common as Johnson, it is fair to impose upon him some of the risk that another Johnson may wish to sell goods not very far afield; and he must show a substantial interest if he would seriously impair the second Johnson's privilege to use his own name in customary ways.").

### Survey Evidence on Likelihood of Confusion

To prove its claim of trademark infringement, plaintiff SPG must show that mySimon's use of the name "mySimon," the Simon cartoon figure, and/or the Internet domain name *mysimon.com* is likely to

cause confusion among consumers about the source or affiliation of defendant mySimon's or plaintiff SPG's services. *E.g., International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988).

■ Consumer surveys are generally accepted by courts as one means of showing the likelihood of consumer confusion. To be admissible, the survey must be conducted by qualified experts and impartial interviewers. It must consist of non-leading questions presented to an appropriate "universe" of respondents. The responses must also be recorded and interpreted in an unbiased manner. See generally *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir.1992) (affirming summary judgment based on finding that consumer survey of secondary meaning was too flawed to create a genuine issue of material fact because questions were biased and telephone survey was not reliable); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (crediting survey conducted in fair manner by qualified experts who surveyed relevant universe of consumers on issues central to case); *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d at 385–88 (district court erred by not finding likelihood of confusion in light of relevant survey conducted in unbiased manner by qualified experts). In addition to these requirements, survey evidence, like any evidence, must be relevant to the issues in dispute. Fed.R.Evid. 402.

Several models for consumer surveys on likelihood of confusion have found acceptance in the courts. See, *e.g., Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d at 385–86 (consumers were shown accused mark and were asked who puts out the product and what other products that company puts out, all without showing or asking consumers about plaintiff's mark); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507–08 (5th Cir.1980) (consumers looked at sign with accused "Texon" mark and were asked the first thing that came to mind when looking

at the sign, and then what it was about the sign that made them say that, all without showing or asking about plaintiff's "Exxon" mark); *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1089–90 n. 4 (8th Cir.1980) (accused mark and plaintiff's mark shown together; consumers were asked whether they thought the two products were put out by the same companies or different companies, and what made the respondent think that); see also, *e.g., Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir.1992) (district court erred by rejecting survey showing that 24 % of consumers who were shown a label of test product called "Thirst–Aid" thought it was produced by Gatorade; consumers were not shown "Gatorade" mark or label in the survey).

■ No survey model is suitable for every case. At bottom, however, a survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace. See, *e.g.,* 5 McCarthy on Trademarks § 32:163 at 32–237 (4th ed.1999) ("the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results"); accord, *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d 1122, 1126 (10th Cir.1991) (rejecting survey that did not mimic market conditions; respondents' confusion about named companies' headquarters was meaningless where respondents were not given additional information, such as address and telephone number, that was present in the challenged advertising); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487–88 (10th Cir.1987) (district court properly discounted results from survey using side-by-side comparison of products that failed to reflect actual marketplace conditions); *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir. 1983) (noting that consumer confusion is often shown by "some form of survey of

consumer attitudes under actual market conditions"); *ConAgra, Inc. v. Geo. A. Hormel & Co.,* 784 F.Supp. 700, 734 (D.Neb.1992) (discounting survey results where consumers were given as much time as they wanted to study the marks in question; the method created a "reading contest" that did not reflect marketplace conditions), *aff'd,* 990 F.2d 368 (8th Cir. 1993); see also *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1245–46 (9th Cir. 1984) (even where marks were identical when viewed in isolation, determination of likely confusion required consideration "in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the pens," which sufficed to distinguish the two marks except in context of telephone solicitation, where such distinctions were not evident).

No survey is beyond criticism, especially in the context of litigation. Courts therefore recognize that many criticisms of surveys used in litigation are appropriate topics of cross-examination and contrary evidence to reduce the weight of the survey without requiring that the it be excluded. See, *e.g., AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 618 (7th Cir.1993); *McGraw–Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1172 (7th Cir.1986); *Henri's Food Products Co. v. Kraft, Inc.,* 717 F.2d 352, 357 (7th Cir.1983); see also *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club L.P.,* 34 F.3d 410, 416 (7th Cir.1994) (survey evidence need not be perfect to be admissible).

█ There are limits, however. The court need not and should not respond reflexively to every criticism by saying it merely "goes to the weight" of the survey rather than to its admissibility. If the flaws in the proposed survey are too great, the court may find that the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial. See Fed.R.Evid. 403; *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 297 (2d Cir.1999) (affirming Rule 403 exclusion of survey evidence that amounted to "little more than a memory test"); accord, *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d at 394 (affirming summary judgment based on finding that consumer survey of secondary meaning was too flawed to create a genuine issue of material fact); *AHP Subsidiary,* 1 F.3d at 618 (acknowledging there will be "rare" occasions when the proffered survey is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible"), citing *Delavan.*[3]

█ Simon's motion in limine also asks the court to perform before trial a variation of the gatekeeping function the court must perform for expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Consumer survey results must be presented through expert witnesses. Under *Daubert,* the gatekeeping function requires the court to ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. The court's responsibility is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at

---

**3.** The vast majority of reported cases dealing with problematic survey evidence have involved injunction hearings or bench trials. In such cases, the safest course for the trial judge is to admit the evidence and to treat the criticisms as going to the weight of the evidence, for reasons that Judge Glasser explained and criticized in *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1202 (E.D.N.Y.1983) (excluding survey by a "Dr. Sorenson" in bench trial); accord, *e.g.,* *Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 390 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir.1986). This case is scheduled for a jury trial. The court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time-consuming, as this survey evidence would be, when it offers essentially nothing of real probative value. Rule 403 was written for just this sort of case.

152, 119 S.Ct. 1167. The object is to ensure that when scientists or other experts testify in court, no matter how eminent their credentials and qualifications, they adhere to the same standards of intellectual rigor that are demanded in their professional work. *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318–20 (7th Cir.1996) (excluding speculative opinion from chair of University of Chicago medical school department).

■ Courts have generally found consumer survey evidence admissible under *Daubert* if a qualified expert testifies that the survey was conducted in a proper manner, see *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir.1997), but that will not always be the case. The gatekeeping inquiry must be " 'tied to the facts' " of a particular case. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. Expert testimony concerning survey results may not be reliable if the survey format does not accurately gauge consumer confusion between the marks at issue. See *National Football League Properties, Inc. v. ProStyle, Inc.*, 57 F.Supp.2d 665, 672 (E.D.Wis.1999).

The Supreme Court cautioned in *Daubert* that: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. 2786. Nevertheless, *Daubert* and *Kumho Tire* themselves show there are limits, upholding as they did the exclusion of expert testimony not shown to be sufficiently reliable and relevant.

The question here under Rule 702 is whether the results of SPG's proposed surveys will be sufficiently reliable to use in court and whether they are likely to assist the trier of fact decide an issue in the case. The court also can and should use its power and duties under Rule 403 to exclude evidence with great potential for confusion, unfair prejudice, and waste of time when that evidence would have little probative value. See *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club L.P.*, 34 F.3d at 414–15 (cautioning about the dangers of market research testimony by retained expert witnesses).

### The Proposed Surveys

SPG proposes to conduct mall-intercept surveys using three separate survey formats. The first asks respondents to view and then respond to questions about the mySimon home page and then the SPG home page. The second asks respondents to view and respond to questions about five print advertisements for Internet shopping sites. The third format asks respondents to view and respond to questions about four television advertisements.

The survey universe for all three formats is identical with a common set of screening questions. SPG proposes to conduct the surveys at four "brick and mortar" shopping malls, two Simon malls and two non-Simon malls. The screening questions will be used to limit the surveys to respondents who: (a) have Internet access at home or at work; (b) have used the Internet in the last three months to visit web sites "for the purpose of obtaining shopping information such as products available and prices;" (c) do not work for and have no household members working for a market research company, advertising or public relations firm, or an Internet-based company; (d) do not work at a business in the mall where the survey is being conducted; and (e) are over 18 years old.[4]

---

4. The revised survey changed the proposed universe in two important respects. First, the original proposal was not specific about whose malls might be used. Some preliminary test results indicated that they would be conducted at Simon-owned or Simon-managed malls with Simon trademarks even in view during the interviews. SPG stated in the revised proposal that only two of the four mall sites would be Simon-owned or Simon-managed malls, and that all interviews would be conducted out of sight of any Simon signs. See Block Decl. II ¶ 17. Second, the original proposal would have included anyone who had used the Internet in the last three months for any purpose at all. In response to mySimon's criticism that such a universe would be

If the respondent is not excluded by the screening questions, the interviewer asks the respondent to come to an office area where the respondent is told to answer the following questions "as best you can, do not guess." The interviewer tells the respondent that it is "perfectly acceptable" to answer "I don't know" if that is the case.

The court considers first the home page survey and then turns to the surveys based on print advertising and television advertising.

## I. *The Home Page Survey*

■ In the home page survey, the respondent is first shown a card depicting the mySimon home page. While the respondent is looking at the card, the interviewer asks "What services, if any, might you be interested in that are offered on this web site?" After recording the response, the interviewer takes back the mySimon card, hands the respondent a card depicting the SPG home page, and asks the same question. After recording this answer, both cards are placed out of the respondent's sight. The interviewer then asks "Do you believe that the two web pages just shown to you are put out by (a) Two unrelated sources, companies, or organizations; (b) The same source, company, or organization; (c) Related but different sources, companies, or organizations; or (d) Don't know?" If the respondent answers (a), (b), or (c), the interviewer then asks "Why do you say that?" and "What else?"

SPG's proposed home page survey suffers from three serious flaws: (a) it grossly distorts the "marketplace conditions" in which Internet users might actually encounter the two parties' marks together; (b) it fails to use the most basic control by failing to compare potential confusion with respect to other "Simon" web sites not related to either of these parties; and (c) it is designed to create "demand effects" that will appear to exaggerate unfairly any possible confusion about affiliation between SPG and mySimon. Although no survey is beyond criticism, these problems are so fundamental that the court does not believe it would be fair to treat them as matters going only to the weight of the evidence. They are so basic as to strip the proposed survey of any significant probative value. The court concludes under Rule 702 and Rule 403 that the proposed home page survey should be excluded from evidence.

### A. *Reflecting the Market Situation*

Professor McCarthy has written that "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." 5 McCarthy on Trademarks § 32:163 at 32–237 (4th ed.1999). SPG's home page survey creates a situation in which respondents are shown the SPG and mySimon home pages one right after the other.

Defendant mySimon contends the court should reject any survey using such a direct comparison because such a sequential or side-by-side encounter would virtually never occur in the marketplace. On that basis, mySimon contends that an *"Eveready"* survey, in which the respondent would see only mySimon's home page and would be asked non-leading questions to see if the respondent associates it with SPG in some way, is the best way to test for relevant confusion. See pages 32–34, below. Unless consumers are likely to encounter the mySimon and Simon home pages together, mySimon contends, the proposed survey cannot lead to results that would accurately measure any possible consumer confusion between the two marks.

SPG contends it is justified in presenting the two parties' home pages in sequence because a consumer might encounter both home pages together by using a

---

too broad, the revised proposal restricts the universe to respondents who have visited sites

in the last three months for purposes of gathering shopping information.

search engine on the Internet. To show that a user could encounter the two home pages together, SPG has offered the results of several Internet searches using different search engines and the words "simon," "shopping," "malls," "mysimon," "mall," and "shop." See Marsey Aff. Exs. 2, 3 & 6; Pl. Exs. 151, 152, 153, 154A & 154B.

Numerous search engines are available on the Internet. They employ a variety of criteria for selecting, categorizing, and displaying search results. Using common terms such as "simon" and "shopping" in different search engines produces a range of different results. In searches done for this lawsuit using the words "simon" and "shopping," for example, two searches put mySimon's home page in the first position of the search results (Infoseek and YahooWeb), while other search engines did not show mySimon's home page at all (Yahoo, AltaVista, and Magellan). Marsey Aff. Ex. 1 at 19.

Thus, contrary to mySimon's argument, the evidence indicates that links to the SPG and mySimon home pages can appear together, at least in some search results. The open questions are how commonly consumers see these links together, and in what context. For purposes of SPG's motion, however, the court assumes that some encounters do occur in the marketplace when Internet users employ various search engines to help them locate helpful web sites.

SPG's expert, Dr. Block, suggests that a consumer could be confused in what he describes as "a very typical INTERNET shopping trip such as the following:"

The consumer wants to know if the Simon Mall in her area offers gift certificates, and if so, how to obtain these. Her choice is to use the INTERNET.

(a) The consumer uses her computer to enter the INTERNET marketplace.

(b) This consumer does not know the website address for the Simon Mall in the area.

(c) The consumer uses a search engine to see how she may get to the right website to answer the questions she has about the gift certificates.

(d) In her usual fashion, this consumer enters "Simon–Shopping." The search engine produces a list including mySimon.com as well as at least one specific Simon Mall reference among other references. The next choice is the consumer's.

(e) This consumer is also aware that the prefix "my" is often used as a way of personalizing websites that have other site addresses; e.g., CNN.com has myCNN.com or MaryKay.com has myMaryKay.com.

(f) Seeing mySimon.com as an early listing developed through the search engine use, this consumer goes to the mySimon website and proceeds to determine what gift certificates are available and how to obtain these. What else may be a factor?

(i) The list of alternative sites delivered via the various search engines is dynamic from day-to-day; it can be influenced by such factors as slotting fees and the addition of new web sites.

(ii) In the illustration outlined, it would be entirely possible for the confused consumer to purchase gift certificates for use with a retailer that has a store in a Simon Property Mall through the mySimon web site. This could be transacted in just a matter of minutes after beginning the search without ever knowing that she had not actually accessed the Simon Property Group website.

Block Decl. III ¶ 8.

This strained and conclusory hypothetical glides over the critical points, which Dr. Block's proposed survey also fails to take into consideration. The first critical point it glides over is the consumer's choice among search results. SPG's own evidence shows that the consumer viewing search results will see much more than the domain names of the responsive sites. One can reasonably expect that additional

information to influence the consumer's choice of sites, especially in light of whatever led the consumer to enter the particular search terms in the first place.

In addition, as mySimon has noted, Dr. Block has not offered anything other than speculation to show that this hypothetical shopper could actually get through this hypothetical transaction without realizing that the gift certificates she is buying will not be usable in the desired way—at any store in a Simon-owned or Simon-managed mall. As Dr. Simonson pointed out, consumers rarely stop at home page. Simonson Decl. I ¶ 14(a). In Dr. Block's hypothetical, the consumer would not be able to purchase gift certificates on either party's home page, see Pl.Ex. A (cards XO and CT) (linking to additional pages for gift certificates). Dr. Block has not addressed the additional information the consumer would encounter along the path to the eventual transaction.

Regardless of the uncertainty about just how and why a consumer might search for something that would generate search results including both mySimon and SPG sites, the more fundamental issue here is whether the proposed survey methodology is a fair gauge of potential confusion in this type of situation, that is, whether the proposed survey reasonably reflects actual market conditions.

If the possibility of consumer confusion between these two sites stems from the use of search engines to find either the SPG or mySimon home page, then the survey should reflect this source of possible confusion. SPG's home page survey fails to do so. It calls for the respondent to view the home pages of the SPG and mySimon web sites, and only those pages. The survey does not ask respondent to view actual search engine results containing hyperlinks to these sites in a way that might actually occur in the marketplace, at least according to the argument and evidence presented by SPG. The differences are critical for fairly gauging the danger of confusion. They make the proposed survey nothing more than a meaningless memory game or word association exercise that bears no relationship to the marketplace.

This is evident from the actual search engine results SPG has placed in the record. For example, a "Go.com" search of "simon and shopping" produced more than 56 million responsive websites. Even the top responses show considerable variety and a great deal of information that SPG excludes from the survey method. MySimon came up as the first response with the description: "MySimon: Simon's Search & Compare Shopping: Comparison shop for products in categories such as books, computer software, PC games, computer desktops, coffee, music, movies & video, fitness equipment, flowers, fragrances and more." Marsey Aff. Ex. 2 at page 1 of 2.

The second response to the same search is related to SPG: "Smart AIM Corporation: Free Internet Access, Electronic Shopping for Simon Customers INDIANAPOLIS, Dec. 3, 1997—Simon Brand Ventures, a division of Simon DeBartolo Group, Inc. (N.Y.SE: SPG) the world's largest ..." The third site appears to be a press release from the United States Department of Justice. The fourth response is for "SIMON & SCHUSTER ENCYCLOPEDIA by SSI SIMON & SCHUSTER" with the description "Books Software Hardware Games E-downloads Over 40,000 Software Titles Search." The fifth response is "The Tribute to Simon and Garfunkel." Additional responses reflect even greater variety.

In another search of "simon and shopping" on GoTo.com, SPG has submitted the first 40 responses. The first was "mySimon inc.—Comparison Shopping," with the description: "He shops thousands of stores so you don't have to! Key word Search. Search Tips Apparel Books/Media Computers Electronics Flowers Gourmet Health Home Leisure Office Sports Toys Member Login!" Marsey Aff. Ex. 2 at page 1 of 6.

The second was for "Direct Hit. One Search Engine. Millions of Minds," with the description: "Search for.. web sites

shopping categories Advanced Search Tip: leave a space between words Shopping Find the most popular deals on these hot products: Apple iBook Flowers Rio MP3 Player Austin Powers Movies Cargo Pants DVD Players Harry Potter ..." The third response is the first with an apparent connection to SPG, a site for the Mall of America in Minnesota. The first explicit reference to SPG in the descriptions came in the eighteenth response. *Id.* at page 3 of 6.

Responses for this search and others also include sites for Simon & Schuster publishing, a poster shop in the United Kingdom selling "Simon Bull" posters, a primer on embedded software written by one David E. Simon, sites for St. Simon Catholic School and the Church of St. Simon the Apostle in Toronto, as well as sites for Amazon.com, for the singers Paul Simon and Carly Simon, for glassware at Simon Pearce in Vermont, a guide to shopping the Hamptons, a Simon Says florist shop on the Internet, as well as a number of press releases on business transactions relating to Simon Property Group. See Marsey Aff. Exs. 2 & 3.

Thus, SPG's own evidence of search results shows that if an Internet user encounters together the home pages of mySimon and SPG (or at least links to them), the encounter will be the result of a search engine using a fairly broad search request. In that event, the user will confront a host of search results with a wide variety of types of sites. Moreover, the results are not limited to a mere list of URL addresses. The results will also include some additional descriptive information about the responsive sites. That information will help the user determine which ones are most promising for the purpose of the search. Any Internet user is familiar with the confusion one confronts with such a welter of search results, but that confusion is the uncertainty about where to go next, not necessarily the confusion that is relevant for purposes of trademark law.

Even giving SPG the benefit of the doubt as to whether Internet users will ever encounter the two parties' home pages together, such as in the results of a search for "simon and shopping," SPG's proposed survey method departs from and distorts that experience in the marketplace. The survey would distort that experience by presenting *only* those two home pages together. That approach removes entirely the confusion one encounters with scores, hundreds, or thousands of responsive websites, and it removes the inevitable need for some effort on the part of the Internet user to sort through the responses. SPG's method would also distort the experience by removing the additional information available to help sort through those results. See Simonson Decl. II ¶ 5. The obvious effect of these distortions would be to exaggerate any confusion that might be detected, which thoroughly undermines the reliability of the surveys. See *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d at 1126 (survey respondents' confusion about named companies' headquarters was meaningless where respondents were not given additional information, such as address and telephone number, that was present in the challenged advertising); *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d at 1487–88 (district court properly discounted results from survey using side-by-side comparison of products that failed to reflect actual marketplace conditions); *ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F.Supp. at 734 (discounting survey results where consumers were given as much time as they wanted to study the marks in question; the method created a "reading contest" that did not reflect marketplace conditions); *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670, 685–86 (S.D.N.Y.1963) (discounting results of survey by Dr. Sorensen tending to show confusion where survey did not show respondents a display card that would be found with product at point of sale, but admitting survey because other answers tended to show confusion even when the display card was seen); *W.E. Bassett Co. v. H.C. Cook Co.*, 164 F.Supp. 278, 285 (D.Conn.1958) (discounting results of sur-

vey in which defendant's name on knife and sales display were not visible, as they would be in actual sale); see also *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d at 1245–46 (even where marks were identical when viewed in isolation, determination of likely confusion required consideration "in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase of the pens," which sufficed to distinguish the two marks except in context of telephone solicitation, where such distinctions were not evident).[5]

SPG has argued that it is concerned that someone "surfing" the web may "inadvertently encounter the *mysimon.com* site or advertising after having been to a Simon mall, and reach conclusions that all or parts of *mysimon.com* are associated with Simon," or, in the alternative, mistakenly end up on the SPG home page while looking for the mySimon home page. SPG Reply Br. at 4. SPG has stated that it has a number of examples of such consumer mistakes that have already occurred. The record does not contain evidence, however, that such mistakes occurred after sequential comparisons by consumers of the parties' home pages.[6]

**B. *Failure to Use Adequate Controls***

SPG's proposed survey also fails to include adequate controls that take into account the fact that the name "Simon" is used extensively on the Internet for commercial purposes. Those many other uses clearly do not infringe SPG's trademark rights, but they may well "confuse" consumers just as SPG contends mySimon's use of the Simon name does. By failing to use such controls, SPG's proposed survey amounts to little more than a meaningless word association or memory exercise.

All of SPG's claims of likely confusion depend, of course, on the similarity between the names "Simon" and "mySimon," as well as on mySimon's use of the "Simon" cartoon character. As mySimon has pointed out from the beginning of this case, commercial use of the name "Simon" is not unique to SPG, either on the Internet or in brick-and-mortar stores. The record here shows, for example, that the name "Simon" shows up in Internet commercial uses with Simon & Schuster publishing, Simon Says, Simon Pearce, Simon Burke, Simon Magus, and entertainers Paul Simon and Carly Simon.[7]

---

**5.** It is clear that Dr. Sorensen is not entirely comfortable with Dr. Block's proposal to confront respondents with both parties' home pages and marks in close sequence. Both of his affidavits suggest that exposure to the two parties' web sites or URL's be separated by more than a few seconds, such as an hour or even a day. Dr. Sorensen stated in his second affidavit:

> While granted that the presence of both disputed stimuli, Simon and mySimon, in any single survey interview may not always be typical in the marketplace for some respondents. [sic] Courts have accepted such a replicated dual presence in a survey interview under a variety of circumstances as long as it does not invite an obvious simultaneous side-by-side comparison of the two items. Thus the two names at issue in this case could be presented among several names, or could be presented seriatim with intervening variables introduced such as reading or TV program materials over defined time intervals.

Sorensen Decl. II ¶ 10. The court agrees with this criticism of Dr. Block's proposal.

**6.** SPG has also offered evidence of an Internet search in which its own web site is listed on the same page that a "banner ad" for mySimon appears, featuring the "Simon" cartoon character. See Marsey Aff. Ex. 3 at page 1 of 2. From this evidence, SPG argues that the two parties' marks can indeed appear simultaneously to an Internet user. However, the proposed SPG survey format does not try to test for potential confusion in the situation reflected by that search result.

**7.** The evidence at the hearing on plaintiff's motion for a temporary restraining order also shows widespread use of the name "simon" in domain names for commercial sites on the Internet, including *simonandsons.com* (clothing store in Massachusetts); *simondelivers.com* (home grocery delivery service in Minnesota called "Simple Simon"); *simonmusic.com; simonsells.com* (Simon & Schuster publishing); *simple-simon.com* (pizza parlor in Oklahoma); *simonxpress.com; sim-*

SPG's proposed survey technique would disregard entirely the fact that other businesses, including other large and relatively well-known ones, use "Simon" as part of their names on the Internet and could also be confused with SPG. The court inquired at the hearing whether the survey should include a control with one or more other web addresses or web pages (real or fictional) that use "simon" as a major part of the address or name, such as *simonschuster, simononline, simon.net, simon.org*, etc. SPG's experts, Dr. Block and Dr. Sorensen, have asserted that such a control would not be appropriate here. The two experts offer two very different and inconsistent reasons for this refusal.

Dr. Block said in his latest affidavit that, for a control to account for possible "noise" in the survey results, "the most appropriate alternative website to use is that of a company that offers online shopping services," such as Lycos.com or Goto.com. Block Decl. III ¶ 3. Dr. Block added that using a website as a control "that simply includes some configuration of the name Simon that represents a company that does *not* offer competitive shopping services only adds noise to the survey results," and that such an approach would become simply "a word association exercise." *Id.* at ¶¶ 4 & 5.

Dr. Sorensen took a different approach: This additional or surrogate stimulus likely will not contribute materially to a survey of likelihood of confusion in this case. A stimulus must be found that on the one hand is known so that a meaningful test exists, but on the other hand is not so differentiated in perceived image and function that common sense would argue against their confusion in the minds of anyone knowing the identity of the two companies. This is easier said than done, despite the existence of thousands of web sites with Simon in their name or contents. Simon & Schuster, for example, is a famous name that I believe would not qualify as a control for reason of this latter factor. Sorensen Decl. II ¶ 11.

With all due respect to Dr. Block and Dr. Sorensen,[8] they have not justified SPG's refusal to include as a control here some other variations of web sites that include the name "Simon." They have instead assumed the problem away, reducing the proposed survey to a word association exercise.

Recall that SPG justifies the proposal to show respondents both home pages in sequence by relying on evidence of "simon" search results listing both home pages. As SPG's evidence demonstrates, however, if an Internet user confronts *simon.com* and *mysimon.com* as two results of a search, she will not encounter them in isolation. She will encounter at the same time a host of other results that will also include the name "Simon." It would be reasonable to expect that at least some percentage of Internet users who use the types of searches SPG relies upon to justify joint presentation of the two home pages might experience some confusion in sorting through different "Simon" Internet sites and addresses, especially if they are being asked about possible affiliation between different "Simon" sites. That ex-

---

*plysimon.com; simonsays.com* (Simon & Schuster publishing); *cybersimon.com; eshopsimon.com; esimonshops.com; 4simon.com; bysimon.com; poorsimon.com; simonduz.com; isimon.com; searchsimon.com; simon-sez.com; funkysimon.com; gosimon.com; gotosimon.com; herbsimon.com; mallsimon.com; mrsimon.com; mrssimon.com; saysimon.com; mrsimonsez.com;* and *hellosimon.com.* Ex. 1083. Another exhibit from that hearing shows the result of an online trademark search for "Simon" that found 128 responsive marks. Ex. 1059.

**8.** Professor McCarthy has cited the "experienced survey expert Robert Sorensen," see 5 McCarthy on Trademarks § 32:178 at 32–267 (4th ed.1999), and Dr. Sorensen's 1953 law review article on opinion research evidence was cited with approval in *Zippo Mfg. Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 682 n. 83 (S.D.N.Y.1963), citing R.C. Sorensen & T.C. Sorensen, *The Admissibility and Use of Opinion Research Evidence,* 28 N.Y.U. L.Rev. 1213 (1953).

pectation would be easy to test using a control not directly involving either of these two parties' sites.[9]

Evidence that an Internet user is confused by a search engine's collection of many "Simon" sites would not show that SPG is entitled to relief against all other Simon sites. SPG does not and could not claim to have exclusive rights to the name "Simon" on the Internet. A user who is equally confused by mySimon, by "Simonsays," and by other Simon sites does not show legally relevant confusion. SPG must show there is something different about mySimon that makes it *more* confusing than a level of perhaps inevitable confusion based solely on the name. On the other hand, if use of a proper control showed that consumers have no trouble distinguishing most "Simon" sites from one another, then SPG would have taken a long step toward showing that any confusion between its site and mySimon's site was a result of legally relevant confusion.

By refusing to test whether any possible confusion between these two parties is a result of the competitive proximity between the services offered by SPG and mySimon, or instead the result of mere similarity in names, SPG is refusing to test for truly relevant consumer confusion. See *Cumberland Packing Corp. v. Monsanto Co.,* 32 F.Supp.2d 561, 574–75 (E.D.N.Y.1999) (rejecting survey as unreliable, in part because controls failed to use names similar to plaintiff's product and failed to account for legally irrelevant causes of potential confusion); cf. *Indianapolis Colts,* 34 F.3d at 415–16 (in trademark case involving professional football teams, district court could properly rely on survey results showing confusion as to "Baltimore CFL Colts" when separate control survey was done testing trademark of fictional "Baltimore Horses" football team).

It is most telling here that Dr. Sorensen's affidavit does not endorse Dr. Block's

explanation for failing to include another form of "Simon" as a control. Instead, Dr. Sorensen justifies the failure to use such a control on the need to find a control that is "known" but "not so differentiated in perceived image and function that common sense would argue against their confusion in the minds of anyone knowing the identity of the two companies." Sorensen Decl. II ¶ 11. This explanation is inconsistent with the rest of SPG's proposed survey. In light of Dr. Sorensen's explanation, it is difficult to understand, for example, why SPG's experts believe it is appropriate to test the mySimon television advertisement against ads for General Motors and the Marine Corps. Surely "common sense would argue against their confusion in the minds of anyone knowing the identity of the two companies." Dr. Sorensen also does not explain why it is important that the control be "known;" he merely asserts that it is. Yet that assertion seems to conflict with his assertions that the proposed survey formats are appropriate even though SPG's Simon mark itself is not "well known." See Sorensen Decl. I ¶ 19; Sorensen Decl. II ¶ 6. Finally, if it were truly important that the control be well known, it is also difficult to see how Dr. Block's proposed controls using other Internet shopping services, such as Lycos.com or Goto.com, would meet Dr. Sorensen's standard.

Apart from these shortcomings, Dr. Sorensen's treatment of the control issue similarly fails to come to grips with SPG's basis for asserting that Internet users may occasionally encounter the two parties' home pages together. Again, the evidence of results from search engines shows that SPG's hypothetical Internet surfer will receive search results that include a host of sites with the name "Simon" in them in one form or another. The search results will also include, depending on which search engine is used, at least some form of additional information about the sites so

---

**9.** In criticizing Dr. Block's and Dr. Sorensen's testimony for assuming away this phenomenon, the court is not assuming that such

confusion would exist. Rather, the possibility of such confusion can be tested by using appropriate controls in the survey.

that the user has some help in sorting through the results and finding what she is looking for. SPG's proposed survey distorts this reality in the marketplace by eliminating both the additional sites with somewhat similar names, as well as the additional information and clues for figuring out which sites are worth visiting.

Thus, the absence of adequate controls to test for legally relevant confusion provides another independent reason for excluding the results of SPG's proposed home page survey.

### C. Demand Effects

There is a third significant problem with SPG's proposed home page survey. The survey's questions implicitly suggest to the respondent the possibility of a business connection between the SPG and mySimon home pages that the respondent may not have made on his or her own. See Simonson Decl. II ¶ 18.

SPG reports that it has not discovered any published decisions in which a survey was used to test for likelihood of confusion "in the dynamic and ever-changing Internet context." SPG Renewed Reply Br. at 3. SPG describes its home page survey as an adaptation of the *"SquirtCo "* format. See *id.,* citing *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086 (8th Cir.1980). In *SquirtCo,* two soft drinks had the names Squirt and Quirst. The district court found a likelihood of confusion based in part on survey results. The two surveys asked respondents to listen either to just the two names or to radio advertisements. The respondents were then asked whether they thought the two products were put out by the same or different companies, and what made them think that. 628 F.2d at 1089–90 n. 4. The Eighth Circuit affirmed a finding of likelihood of confusion based in part on the survey.

SPG has modified the *SquirtCo* format in one important respect. The *SquirtCo* format in the reported cases offers the respondent three possible answers: same, different, or don't know. SPG insists on including a fourth answer, that the two

web pages are put out by "related but different companies or organizations." Pl. Ex. A. SPG has not cited any case approving that additional, ambiguous twist on the *SquirtCo* format, which is likely to create a bias in favor of a finding of confusion. See Simonson Decl. I ¶¶ 14(c) & 15(d). The question about whether the two items are put out by the same or a related source is likely to generate so-called "demand effects" that bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items.

Other courts have identified similar problems in similar surveys. See, *e.g., Wuv's International, Inc. v. Love's Enterprises, Inc.,* 208 U.S.P.Q. 736, 755–56 (D.Colo.1980) (survey question "Do you believe that this restaurant is connected with or related to any other restaurants?" improperly suggested to respondent that another entity may be connected with or related to the party); *Beneficial Corp. v. Beneficial Capital Corp.,* 529 F.Supp. 445, 450 (S.D.N.Y.1982) (finding that question: "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" did not elicit an uninfluenced response; the survey "establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption, that, in the absence of any other information, two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions, and we conclude that there is no meaningful evidence of actual confusion."); see also *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir.1984) ("To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" improp-

erly suggested a connection to respondents); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 U.S.P.Q.2d 1321, 1333–34 (Trademark Tr. & App. Bd.1992) (showing respondents bags from each party's stores and then asking if they believed the two stores had a business association improperly led respondents to the desired result; the key criticism was offered by a Dr. Sorensen).

Respondents viewing the SPG and mySimon home pages might not draw a business connection between them without the proposed multiple choice answers suggesting the possibility of such a connection. To some extent, these potential demand effects are inherent in the *SquirtCo* format, in which the interviewer is instructed to ask a question that raises the issue about a possible relationship or affiliation between the two marks or entities. However, SPG is trying to take the *SquirtCo* format a step farther than any other court has taken it by introducing an additional possible answer. The court does not necessarily view this problem as so serious by itself as to require exclusion of the home page survey, but it adds to the other reasons for excluding the survey.

### D. *Initial Interest Confusion*

SPG also says it is concerned about what is known as "initial interest confusion." Initial interest confusion can occur when a business creates a mark that is similar to a more widely known mark, and the similarity leads consumers to the junior mark's product or service. Even if the consumer at that point learns there is no affiliation between the parties, initial interest confusion can still be actionable in some circumstances. See *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 638 (7th Cir.1999) (recognizing theory but finding no material harm); *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 382 (7th Cir.1996) (recognizing theory but finding such confusion had not been shown); see also *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1064 (9th Cir.1999) (finding violation based on initial interest confusion where defendant used plaintiff's trademark in the metatags of its web site intentionally to divert users); *Eli Lilly & Co. v. Natural Answers, Inc.*, 86 F.Supp.2d 834, 846 (S.D.Ind.2000) (enjoining defendant from continuing to use plaintiff's "Prozac" trademark as metatag on its web site, and collecting cases on use of trademarks in metatags to divert Internet traffic).

In this case, for example, initial interest confusion could occur if a consumer mistakenly accessed mySimon's web site while looking for SPG's web site. Even if the consumer immediately became aware of his or her mistake and immediately learned that mySimon is not affiliated with SPG, initial interest confusion still would have occurred.

The court assumes that "initial interest confusion" might be a viable theory in this case, although there is no evidence at this point, for example, that mySimon has used SPG's trademarks as metatags to divert Internet traffic from SPG's site. The problem is that SPG's proposed surveys are still deeply flawed and cannot provide reliable evidence that any such initial interest confusion occurs here.

### E. *The Debate Over an "Eveready" Format Survey*

SPG's experts have opined that a survey in the *Eveready* format would not be appropriate for this case. In the *Eveready* format, derived from the infringement of the "Eveready" trademark on batteries in *Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d at 385–86, a consumer would be exposed to only mySimon's mark, home page, or other stimulus, and would then be asked "Who do you think puts out this service? What makes you think so? Name any other products or services put out by the same concern that puts out this service." See 531 F.2d at 385. The respondent would not be shown the SPG mark in such a survey. This format is obviously well-suited to determine whether one trademark will confuse consumers who are not likely to encounter the two trademarks together. See, *e.g., AHP Subsid-*

*iary,* 1 F.3d at 613–14, 618 (district court erred by failing to give sufficient weight to results of *Eveready* survey in which about 38 % of respondents who viewed defendant's mark thought they had seen plaintiff's product).

Dr. Block asserts the *Eveready* format is most appropriate where specific products are involved and would be "very difficult to adapt to an extremely dynamic INTERNET service oriented marketplace." Block Decl. III at ¶ 6. With all due respect to Dr. Block, this is simply not an explanation at all. It would seem to be a relatively simple matter to design a survey that exposes a respondent only to mySimon's web site or advertising, to ask who the respondent thinks puts out that service and what other services it provides, and then to see how many respondents come up with SPG or a recognizable variation. See Simonson Decl. II ¶¶ 13–15.

Dr. Sorensen offers a very different explanation for not using the *Eveready* format in this case. He asserts it would not be appropriate because plaintiff's "Simon" name and mark are not sufficiently well-known among people who would be surveyed. Sorensen Decl. II ¶ 6. That explanation is completely at odds with SPG's entire theory of this case, and it amounts to an admission (or at least a confident prediction) that an *Eveready* survey is unlikely to show evidence of confusion here.

Ultimately, however, the question now before the court is not whether an *Eveready* format survey would be appropriate here, let alone how such a survey should be designed. SPG has chosen not to conduct such a survey. It has every right to make that choice. The issue before the court is whether the survey SPG proposes is likely to produce results that would help the jury resolve relevant factual disputes. As explained, the court believes the answer is clearly no.[10]

## II. *The Print and Television Advertising Surveys*

■ Both the print and television advertisement surveys begin with the same "screening" questions used in the home page survey.[11] In the print advertisement version, the respondent is asked to view print advertisements for five online shopping services, one of which is mySimon. The interviewer then removes the cards and asks the respondent if he or she had any difficulty seeing the advertisements. If not, the interviewer hands the respondent a card with plaintiff's *www.simon.com* URL address on it. The interviewer then asks the respondent if he or she would use this "means to try to get to access any of the web sites noted in the ads that you have just reviewed." Pl.Ex. A. If the respondent answers "yes," the interviewer then asks which of these companies the respondent would access with the *www.simon.com* URL address and why he or she said that. The interviewer then removes the *www.simon.com* card and hands the respondent a *www.mysimon.com* card and asks the same questions about using the address to access any of the advertised services.

The final version of the survey asks the respondent to view in sequence four 30-second television advertisements: for Lycos.com (which is a competing online comparative shopping site), then the United States Marine Corps, then General Motors, and finally mySimon. After the respondent views the videotape, the interviewer uses the same cards with

---

**10.** From the outset of this case, SPG has asserted that confusion is likely in this case because many businesses on the Internet add the prefix "my" to their names as a means for personalizing their services. SPG has cited, for example, *myCNN, myMaryKay,* and *myUPS.* MySimon has argued in turn that this practice is far from universal, and it has cited as unrelated examples *myCFO* and *CFO, myAA* and *AA,* and *mygeek.com* and *geek.com.*

An *Eveready* format survey would seem to be at least one straightforward way to test SPG's hypothesis. SPG's proposed survey method does nothing to test this hypothesis.

**11.** In the television advertisement survey, the respondent is also asked if he or she had been interviewed in that mall during the last three weeks. If the respondent answers "yes," the survey is terminated.

*www.simon.com* and *www.mysimon.com* and asks the respondent the same series of questions about using those addresses to access web sites noted in the advertisements. There are two additional questions in the television advertisement survey. After the respondent answers the initial questions, the interviewer asks the respondent to give his or her impression of the mySimon advertisement and why he or she said that.

The print and television surveys suffer from two fundamental and related flaws. First, they are obviously highly suggestive and leading. In fact, they are so suggestive and leading that it is astonishing SPG is even proposing them. In both versions of the survey, the respondent is shown advertisements from different companies, including mySimon. The interviewer then shows the respondent the *www.simon.com* and *www.mysimon.com* addresses and asks if he or she would use these addresses to access the web sites of any of the companies portrayed in the advertisements he or she saw. None of the other advertisements have any connection with the name "Simon." The "correct" answer is perfectly obvious as long as the respondent remembers the names of the advertised companies.[12]

These survey formats therefore test nothing more than the memory and common sense of a respondent, which show nothing probative or relevant about possible consumer confusion. See *Franklin Resources, Inc. v. Franklin Credit Management Corp.*, 988 F.Supp. 322, 334–35 (S.D.N.Y.1997) (where survey respondents were first shown advertisements and then shown letters from companies and asked essentially to link up the company in the advertisements with the companies in the letters, court found that survey "proves something, but not very much" because it tested only a respondent's ability to remember the companies); see also *Starter Corp. v. Converse, Inc.*, 170 F.3d at 297 (court affirmed exclusion of survey under Rule 403 because the survey only tested respondents' memories, not the existence of consumer confusion).[13]

Second, the print and television surveys also fail to include any meaningful controls, such as variations of URL addresses that include "simon" in some other form, such as *simonsays.com, simon.org, simon.net, simononline.com, simonschuster.com, simon-net.com,* etc. SPG does not and cannot claim in this case an exclusive right to use the word "simon" as part of a URL. As discussed above with respect to the home page survey, SPG's retained experts offer two completely different and inconsistent explanations for the failure to include such an obvious type of control in this test. The need for a control using some other form of "simon" in a URL address is, if anything, even greater for the print and television advertising formats, in which the respondent will be given the *www.simon.com* and *www.mysimon.com* URL addresses and asked to identify which of the advertisers he or she would try to contact using that address.

### III. SPG's Motion to Withdraw its Motion in Limine

SPG has complained bitterly in the briefing about mySimon's refusal to coop-

---

**12.** In addition, the television survey asks the respondent if he or she would use the SPG or mySimon URL addresses to access the web sites "noted" in the ads. The Marine Corps ad does not contain any reference to any web site.

**13.** The proposed television advertisement survey is even further flawed by showing advertisements for General Motors and the United States Marines Corps. The Marine Corps advertisement has nothing to do with on-line shopping. Neither advertisement includes the word "simon." Both General Motors and the Marine Corps are obviously so well known that it is difficult to see how any reasonable consumer could confuse them with either of the parties in this case. Cf. Sorensen Decl. II ¶ 11 (control should not be "so differentiated in perceived image and function that common sense would argue against their confusion in the minds of anyone knowing the identity of the two companies"). The result is a survey that is transparently designed to lead the respondent to the answer desired by SPG.

erate in designing surveys that would be acceptable to both parties, and the extra time, effort, and expense SPG has suffered as a result. See note 2, above. After two full rounds of briefing on SPG's motion in limine, the second of which was caused by many obvious and superficial problems in SPG's original proposal, the motion in limine has been ripe for decision for less than six weeks. However, the day before this entry is being released, SPG filed a motion to withdraw its motion in limine. By way of explanation for this unusual step, SPG stated that it had just learned that mySimon plans to conduct a consumer survey without first obtaining a preliminary ruling from the court on either side's planned surveys. SPG added that it will now "proceed immediately with its own survey format, one not necessarily in accord with the detailed version previously submitted."

SPG's motion to withdraw its motion is hereby denied. SPG has forced mySimon and the court to deal twice with its proposed motion. MySimon is entitled to a ruling on those issues. MySimon is also entitled at this time to this court's assurance that it will not face at trial the results of the unreliable and biased surveys SPG has proposed. If there is yet another round of motions in limine shortly before trial, so be it. Responsibility for the failure of the Seventh Circuit's proposed cooperative procedure in *Union Carbide* does not rest, however, on mySimon.

### Conclusion

A fair and unbiased survey of Internet users might produce some evidence relevant to this case, and perhaps even decisive for it. That is not what SPG has proposed. The proposed home page survey bears no reasonable relation to situations in which consumers might actually be exposed to the parties' trademarks in the marketplace. All three versions are highly leading and suggestive. All three fail to include the most elementary form of con-

trol. None will fairly test the likelihood of consumer confusion.

Although SPG's experts have excellent credentials, Dr. Block has proposed surveys that are merely transparent paths to a desired but artificial result, one driven by leading and suggestive questions, distortions of consumer experiences, and without obvious controls. Neither Dr. Block nor Dr. Sorensen has offered any reason to believe these surveys would be acceptable for any purpose outside of litigation. The results of the surveys, therefore, would have little or no probative value on the questions relevant to the case, and they will be excluded under Rule 702 and the principles of *Daubert* and *Kumho Tire*. In addition, the results are likely to create unfair prejudice, confuse the issues, waste time, and mislead the jury. The court will also exclude them under Rule 403. Accordingly, plaintiff Simon Property Group's motion in limine for a ruling approving its proposed surveys on likelihood of confusion is denied.

So ordered.